(No. 11142.—Reversed and remanded.)
LIDA M. CORBLY, Plaintiff in Error, *vs.* LINDSEY CORBLY, Defendant in Error.

*Opinion filed October 23, 1917.*

1. SPECIFIC PERFORMANCE—*the master's report is only advisory.* Where a bill is filed to have a life interest declared in property in pursuance of an oral agreement for the assignment of a contract for its purchase, the master's report, though *prima facie* correct, is of an advisory nature, only, and the question for the consideration of the Supreme Court is whether the decree is proper under the law and the facts as disclosed by the record.

2. SAME—*a complainant must establish contract by clear testimony.* A complainant seeking specific performance must establish the contract by testimony of an undoubted character, which is clear, definite and unequivocal.

3. SAME—*when Statute of Frauds is no defense.* The Statute of Frauds is no defense to a bill to have a life interest in property declared in favor of the complainant, the contract to purchase which she has assigned in consideration of the assignee's oral agreement to permit complainant to occupy the premises for life, where complainant has performed her part of the agreement, has lived on the premises many years and made valuable improvements.

4. SAME—*when complainant's husband is not necessary party to suit.* Where a complainant seeks to have a life interest declared in property as the consideration for her assignment to the defendant of a contract for the purchase of the property, the complainant's husband, who was not an actual party to the agreement and who is hostile to the suit, is not a necessary party although he enjoyed the benefit of the wife's life interest before he abandoned her.

5. FRAUD—*the Statute of Frauds cannot be availed of to accomplish a fraud.* A court of equity will not permit the Statute of Frauds, the only purpose of which is to prevent fraud, to be availed of by a party to accomplish a fraud.

WRIT OF ERROR to the Circuit Court of Ford county; the Hon. GEORGE W. PATTON, Judge, presiding.

KERR & LINDLEY, and SCHNEIDER & SCHNEIDER, for plaintiff in error.

DOBBINS & DOBBINS, for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error filed a bill in chancery in the circuit court of Ford county against defendant in error praying that she be declared to have a life interest in and be decreed a conveyance of the west one hundred and twenty feet of the north half of lot 2, block 4, in the original town of Prospect, (now city of Paxton,) and a right of ingress and egress to and from said premises over the south eight feet of the east forty feet of said north half of lot 2, with full right to occupy said premises as her home and for a millinery store for her natural life, and that defendant in error be perpetually enjoined from prosecuting any suit for the possession of said premises. Issues were formed by the bill as amended and the answer thereto by defendant in error as amended, and the cause was referred to a special master to take and report the proofs and report his conclusions of law and fact thereon. The master in chancery found from the evidence that plaintiff in error had no right to a life estate in said premises. Objections to the master's report were filed by plaintiff in error, which in the main were overruled, and exceptions were preserved by her to said rulings. On a hearing before the court her exceptions were overruled and her bill was dismissed for want of equity. This writ of error assails the correctness of the conclusions of the master, and the decree and finding of the court based thereon, as not warranted by the evidence and the law of the case.

The facts testified to by plaintiff in error are, in substance, that she is a milliner and has been engaged in such business in Paxton since 1892; that she was married to Fred Corbly, the son of defendant in error, in 1896, and that he abandoned her in August, 1911, and shortly thereafter went to Reno, Nevada, to obtain a divorce from her and caused "papers" to be served on her notifying her of such suit; that while she was doing business in the Com-

mandery building she had a conversation with Hannah and
Charles Bogardus, prior to September 11, 1901, in regard
to purchasing the said lot described in her bill; that Mrs.
Bogardus had been a strong personal friend of hers for
some time, and that Mrs. Bogardus said to her, "Lida, I
will give you just as long time as you want in regard to
paying for this lot;" that she (the witness) then said to
Mrs. Bogardus, "What would you think about me going
and talking it over with the Colonel?" (Mrs. Bogardus'
husband,) and she replied that it would be a capital idea,
as the Colonel transacted all her business and could fix it
up better than she could; that afterwards, in September,
1901, she made a written contract for the purchase of said
lot with Mrs. Bogardus, which was signed by Charles Bo-
gardus, as agent of Mrs. Bogardus, and by plaintiff in error,
and that it was left in T. W. Chamberlain's care in Bo-
gardus' office, to hold until the property was paid for; that
defendant in error afterwards, in the presence of plaintiff
in error's husband, Fred Corbly, proposed to her that if she
would assign to him the contract for said property he would
put up on the lot for Fred and her a good, substantial build-
ing that would be a credit to them and to him and to the
town, and that she and Fred should have it for a store
room and a place to live for life, rent free; that they dis-
cussed many times thereafter the description of the building
they would put up provided she would turn the lot over to
him; that Fred had decided to go into the shoe business,
and that defendant in error agreed to put up a store room
in the lower story for the shoe business and millinery busi-
ness and living rooms up-stairs; that she then and there
accepted his proposition, and later on assigned the contract
to him in pursuance of said agreement, after having gone
up to Bogardus' office and informed him that she was going
to assign the contract; that when she went up to his office
she had with her a check for $3000, to which was signed
her name; that defendant in error brought the $3000 check

to her at her store and told her to sign the check and take
it up to the Colonel's office and pay for the lot; that she
took the check to the Colonel and offered it to him in pay-
ment of the lot, and he refused to take it after she had told
him about the agreement with defendant in error and her-
self, on the ground that his wife had not contracted to deed
the lot to defendant in error, and that she had agreed to
deed it to plaintiff in error for less than it was worth and
would not deed the property to defendant in error for that
reason, and he gave her back her check; that she told him
that it was defendant in error's money that was to pay for
it and that the check would be honored at the Lateer bank;
that the reason she told him that was that the defendant
in error had said he would go down to the bank and have
Lateer honor the check, and that she herself had no money
at that time in that bank; that she then went to defendant
in error and told him that Bogardus would not accept the
check for $3000 from him because Mrs. Bogardus was not
willing for defendant in error to have the property; that
defendant in error then asked her if the Colonel had called
up the Lateer bank, and she answered him that she did not
know, and that he then said he was in the bank and thought
he recognized the Colonel calling the bank on the telephone;
that after that she and defendant in error went up to see
the Colonel, and that he said his wife refused $4000 for this
lot just a short time before and that she had contracted it
to plaintiff in error for less for personal friendship; that
she then told the Colonel that she had agreed to assign the
contract to defendant in error in consideration of his agree-
ment to put up a building and give it to her and Fred for
life; that the Colonel then turned and asked defendant in
error if that was true, and he said yes, that he was willing
to build her any kind of building she wanted for her busi-
ness if she would make the assignment to him and that the
building would be hers and Fred's for life, rent free; that
the Colonel said all right,—that if the building was to be

hers and Fred's his wife would make the deed; that she, plaintiff in error, then and there signed her name on the back of the contract, and that they told her that she was signing the contract over to defendant in error. It further appears from her testimony that defendant in error also said that day, in the presence of Bogardus, that his other children all had good homes and places to live and that he intended that plaintiff in error and her husband should have the same; that this conversation also took place in the presence of Chamberlain, the private secretary or office man of Bogardus and custodian of the contract.

Plaintiff in error was corroborated· by Bogardus substantially in every part of her testimony as to her contract with his wife and with reference to the assignment of that contract to defendant in error by her, and as to the conversation at the time the contract was assigned by her to defendant in error. He testified that he made the contract as the agent of his wife, and that he told plaintiff in error and defendant in error when they were together at his office, that his wife was unwilling to deed the property to defendant in error for the sum of money named; that defendant in error then told witness his plan for said building, and stated that he would pay for the lot, put up a good, nice two-story brick building, the up-stairs to be finished off for living rooms and the first floor as a millinery and shoe store, and that Fred Corbly and his wife could have the use of the building as long as they lived, without the payment of rent, and that Chamberlain was present during that conversation. An attempt was made to discredit the testimony of Bogardus by the testimony of Oscar Wylie, a son-in-law of defendant in error, who testified that, a short time before Bogardus testified, he told Wylie, at Pellston, Michigan, that he never heard defendant in error say he was going to give plaintiff in error and her husband a life estate in said property and that defendant in error had never been in his office with plaintiff in error to talk to him about the

property. This testimony was positively contradicted by the evidence of Bogardus.

Plaintiff in error was also corroborated by the testimony of Chamberlain, the secretary of Bogardus, who testified, in substance, that Mrs. Bogardus had made some arrangement to deed the lot direct to plaintiff in error, but that by some change that came about she and her husband deeded it to defendant in error; that in a conversation that was had in the office of Bogardus, in the presence of the latter and himself and plaintiff in error, the defendant in error stated that he was to put up a building both for business and a place for Fred Corbly and his wife to reside, and that they were to have the building rent free. Plaintiff in error was further corroborated to some extent by Mrs. Bogardus, who testified that in her conversation with plaintiff in error about the sale of the lot the witness told her she could have any length of time to pay for the lot; that after the building was under way and the lot had been deeded to defendant in error she drove down-town and stopped in front of the building and spoke to defendant in error, and then said, "Lida is getting along fine with her building," and that he replied, "Yes, I thought I would have to help her, as a woman don't know much about business." Lizzie Walker, a sister of plaintiff in error, testified that defendant in error came to her to borrow money after said building was up, and that he told her that he had built it as a home for his son Fred and plaintiff in error, and that they never had paid him a cent of rent and that he did not expect it.

Plaintiff in error is also corroborated by a number of circumstances disclosed by the record. It appears that Fred Corbly was not relied on very strongly by his father, defendant in error, as a business man and as one to be trusted with the possession of property, because of his reckless habits. One of the promises exacted of Fred by his father before Fred and his wife went into possession of the building was that he should not keep intoxicating liquors there.

Fred and his wife began the occupancy of that building as soon as it was completed, in 1902. The lower story was occupied as a shoe store and millinery store, Fred conducting the shoe business and his wife the millinery business. They occupied the up-stairs part of the building as their home, which contained a parlor, reception room, dining room, maid's room, kitchen, bath-room and two bed-rooms, all finished up in neat and handsome style. During the time the building was being constructed Fred and his wife made many suggestions as to changes, which defendant in error was not willing to make until they agreed to, and did, pay for them, and which were thought by defendant in error to be too expensive. After the building was completed Fred and his wife, and particularly the latter, added many expensive improvements to the building at considerable cost to them. They continued to occupy said building until he left her, in 1911, and defendant in error admits that at no time during that occupancy did he make any demand or suggestion that she pay rent on the building until in May, 1912, after Fred had abandoned her. Defendant in error paid all the taxes on the building and lot during that occupancy except for two years, when they were paid by Fred and his wife. During this time he borrowed different sums of money for Fred and had paid off obligations for him and manifested a disposition to help both of them in this manner. He had also divided up a great deal of his vast estate of $200,000 or more among his other children by making gifts of property, principally of lands, but had never, up to the bringing of this suit, made a gift of land to Fred and placed the title in Fred's name. Fred Overstreet, a very friendly witness for defendant in error, testified upon cross-examination that he knew from all three of the parties, defendant in error, plaintiff in error and her husband, that defendant in error was building a store room there for plaintiff in error and Fred. He further testified that at one time defendant in error told him that he was building

the building for Fred and his wife to occupy, but that he wasn't going to put it in their names because he thought Fred was hardly entitled to have property in his name.

Defendant in error positively denied that he agreed with plaintiff in error that she and her husband should occupy said building free of rent. He also denied the conversations attributed to him by the testimony of Col. Bogardus, Mrs. Bogardus, Lizzie Walker and Chamberlain. The sum and substance of his testimony is that he bought the property in question directly of Bogardus and his wife, and that whatever plaintiff in error did in the purchase of said property was done by her as his agent. He denied positively that there ever was any agreement between him and plaintiff in error for the assignment of said contract between plaintiff in error and Mrs. Bogardus. He even stated at one time, while a witness, that he never knew of the existence of any such an assignment and never heard of it until this suit was begun, and that he did not believe she ever had a contract. He testified that Fred and his wife were to pay rent on the building while they occupied it, but admitted that he had never made any demand upon Fred's wife for rent until May, 1912. In his testimony he failed to state what specific sum, if any, was to be paid by them as rent, and none of his witnesses, including his son Fred, state that there was any specific sum agreed upon as rent, although Fred corroborates him in stating that he agreed to pay rent. He further admitted that Fred had not paid him any rent at any time before he abandoned his wife, but testified that Fred settled with him for the rent but did not pay him. He further stated that he gave a receipt for the rent in 1912 to Fred, but later in his testimony changed the date of that receipt to 1902. He also testified that he asked plaintiff in error in May, 1912, to pay the rent from the time to which Fred had settled for the rent, and that she replied that she couldn't pay the rent and make a living. He was corroborated in this by his son Henry, who testified

that he was present at the conversation. They both testified that she at that time proposed to buy the building. Her explanation of this conversation is that her attorneys had advised her to keep still, and that she said nothing about the rent and permitted Henry and his father to do about all the talking. She denied the conversation with another son of defendant in error, W. S. Corbly, who testified that in February, 1909, when he went to collect the rent for his father, she said to him, "We will pay the rent."

In addition to the foregoing corroboration of his testimony by his son Henry, defendant in error relies upon the corroborative testimony of his son Fred, who was his principal witness. Fred corroborates his father fully in his claim that in negotiating for this property he did so at the instance of Fred and had no dealings at all with the plaintiff in error in its purchase, and that she only acted as the agent of defendant in error at the instance of Fred when she signed the check and secured the contract for the property. Fred's testimony is of such a character that little reliance can be placed on it. His testimony is contradictory all the way through. He positively states at one time that his father gave him the $3000 check, signed by plaintiff in error, and that he took the check at his father's direction, paid for the lot and gave him the deed. He later stated that he gave that check to plaintiff in error and told her to take it and pay for the property. He corroborates his father by stating that his father gave him a receipt or receipts for the first year's rent, but no such receipt or any other receipt for rent was produced in evidence. He positively stated, when asked if he had the contract between Mrs. Bogardus and plaintiff in error, that there was no contract for that lot and that she never had any contract and that such an instrument did not exist. In answer to a question as to whether or not he was the husband of plaintiff in error, he answered that he could not say that he was married to her; that he could not say that her name was

Lida Corbly; that he was not prepared to answer whether or not he at any time went to the clerk and got a marriage license to marry her; that he was not prepared to answer whether or not he went to Reno, Nevada, to obtain a divorce from her, but did finally admit that he had filed a divorce suit against her in that State. He refused to answer on the witness stand who was paying his hotel bills and refused to answer where he gets his money, and then stated, "I am doing everybody that I can to make money; my father is absolutely not paying my board bills and never has." He exhibited considerable feeling against and contempt for plaintiff in error, and abused her after she had testified in this case and accused her of "manufacturing" the contract between her and Mrs. Bogardus, which was finally found and offered in evidence, and told her that he had started out to "get her," and that he would "get her" in the end for manufacturing that testimony.

After about all the testimony was in for both parties before the master, the contract between plaintiff in error and Mrs. Bogardus for said lot, dated September 11, 1901, with an assignment thereon by plaintiff in error to defendant in error, dated October 14, 1901, was found by the trustees in bankruptcy of Charles Bogardus and his wife in the safe of Bogardus that he was using when the contract was entered into. Bogardus, plaintiff in error and her attorneys had been unable theretofore to find this contract. The check signed by plaintiff in error for the $3000 was also produced in evidence, which was dated September 11, 1901, payable to Charles Bogardus or order, and in the lower left-hand corner were these words written by an officer of the bank, "By direction of L. Corbly charge his account." The evidence further shows that this check was cashed by Bogardus at the bank September 12, 1901, and defendant in error admitted in his testimony that he told the bank officers on the morning of September 12 to cash the check and charge to him. The deed to defendant in error was not made until

October 15, 1901, after the assignment of said contract by plaintiff in error.

An examination of the foregoing evidence reveals the fact that plaintiff in error's version of the transactions between herself and Mrs. Bogardus and between herself and defendant in error is corroborated in every detail by disinterested witnesses in this case and by the contracts themselves, with one exception. It was her recollection, as well as that of Bogardus, that Bogardus refused to accept the check in question and deed the property to defendant in error and that she delivered the check back to defendant in error, and that after further negotiations between the parties Bogardus consented to make the deed after receiving another check. The defendant in error testified that she only brought him back a receipt for the sum of $3000 from Bogardus but not the check, and in this particular his testimony is the more reliable. This variation from the true story is of little consequence when all the evidence is considered. The evidence does show clearly and unmistakably that plaintiff in error made the contract for this property and that Bogardus refused to allow it to be conveyed to defendant in error at that time. The delay in making the assignment and in making the deed is complete corroboration of the fact that the negotiations were held up for some reason, and it is not remarkable that plaintiff in error and Bogardus did not remember the details of the transaction in every particular that had taken place many years before they gave their testimony.

The master in chancery found in this case that defendant in error did agree to erect said building to be occupied by plaintiff in error and Fred Corbly as a store room and residence as long as they should live but that he did not agree that it should be so occupied free of rent. The master's report in a case of this character, though *prima facie* correct, is of an advisory nature, only. The facts are all open for consideration in this court, and the ultimate ques-

tion here is, without regard to the master's findings, was the decree dismissing the bill for want of equity the proper one under the law and the facts as disclosed by this record? (*Kelly* v. *Fahrney*, 242 Ill. 240.) It devolved upon plaintiff in error to establish the contract by testimony of an undoubted character, which is clear, definite and unequivocal. (*Lonergan* v. *Daily*, 266 Ill. 189.) We think the evidence in this case warrants only one conclusion, and that is, that the plaintiff in error met all the requirements of the law by her proofs to entitle her to a decree against defendant in error. Further discussion of the evidence is unnecessary. .

The master in chancery stated three circumstances that induced him to find for defendant in error: (1) That at the time of the filing of her bill plaintiff in error failed to allege that she was to get the property rent free; (2) that when rent was demanded of her after her husband abandoned her she did not claim that she was entitled to the property rent free; (3) that it was agreed between her husband and defendant in error, prior to her occupancy of the building, that rent should be paid, and that a receipt was given to Fred for the first year's rent in consideration of improvements made by them. No special significance attaches to either the first or second reason above given, as we view the evidence. The allegations of the bill before it was amended are, in substance, that they were to be owners of the building for life, which implied that no rent was to be paid. Plaintiff in error alleged that in consideration of her assignment of said contract to defendant in error he agreed that "she and her husband could occupy and have said building as a home and as a place" for them to run a millinery and shoe store for and during her natural life. That allegation was followed by the further allegation that they had occupied it from 1902 to their separation without interruption or demand upon her for rent. It was of no consequence, so far as plaintiff in error's rights were concerned, whether or not Fred Corbly promised or paid or

280 — 19

was receipted for rent, even if such were the fact. There is no pretense that she knew of the existence of such facts or alleged facts, and the evidence shows clearly that she did not know those facts until after suit was brought. Her rights could not be prejudiced by any hostile or other act of Fred Corbly not authorized or ratified by her. Her explanation of why she made no direct declaration of her claim when asked for rent is certainly as consistent with her claim as was the explanation of the defendant as to his failure to demand rent from her or to collect rent from Fred or her during their occupancy of the premises. The whole evidence shows that the matter of charging and collecting rent for the premises was an afterthought of defendant in error, not entertained until the abandonment of plaintiff in error by his son.

It appears that on October 15, 1901, the day the deed was executed to defendant in error and delivered to him, there was a failure of Bogardus and defendant in error to agree on the manner in which defendant in error was to join his building onto the wall of the Commandery building, owned by Bogardus' wife, and that the contract was rescinded by them and that Bogardus paid him back the $3000 in money. On the same day, however, the matter between them was re-adjusted, and a special contract was entered into between them as to the use of or connection to be made with the wall of the Commandery building, and the deed was made by Bogardus and his wife to defendant in error and he delivered to them another check for the $3000. There was no change in the original contract except as above stated, and it was still binding on defendant in error. Plaintiff in error was not present when the contract was rescinded and modified as to the party-wall agreement, and her rights were in no way affected by such rescission and change, as she was not consulted in that regard. Her contract with defendant in error remained in full force

when the deed was executed, and he so recognized it by all his acts thereafter until his son abandoned her.

Although the agreement between plaintiff in error and her husband and defendant in error was a verbal agreement it is binding on defendant in error, and his plea of the Statute of Frauds constitutes no defense. Their agreement or promise with each other constituted a sufficient consideration to make a valid contract. She performed her part of the agreement, surrendered her right to become the owner on the favorable terms offered her by Mrs. Bogardus, and took possession of the property and occupied it under the agreement and made lasting and valuable improvements on the building. A court of equity will not permit the Statute of Frauds, the only purpose of which is to prevent fraud, to be availed of by a party to accomplish a fraud. *Gladville* v. *McDole,* 247 Ill. 34; *Gaines* v. *Kendall,* 176 id. 228; *Warren* v. *Warren,* 105 id. 568.

The contention by defendant in error that Fred Corbly was a necessary party to this suit, inasmuch as he was as much interested in the life estate as plaintiff in error, can not be sustained. The contract in question was made between the plaintiff in error and defendant in error, only. Fred Corbly's rights were not prejudiced by his omission as a party defendant or complainant. He arrayed himself against her in this litigation, denied the contract, and denied that he or she had any such rights as contended for by her. In such a case the actual parties to the agreement are the only parties necessary in a suit for specific performance. (*Clark* v. *Jankowski,* 255 Ill. 129; *Denniston* v. *Hoagland,* 67 id. 265.) No attempt was made to take advantage of this contention by demurring to the bill, although the bill clearly disclosed, on its face, Fred Corbly's interest in the premises. Such a defense in this court ought not to receive favorable consideration, and especially since it clearly appears that Fred Corbly was hostile to plaintiff

in error's contention that he or she had a life interest in the premises.

It appears that defendant in error had brought two or more suits against plaintiff in error for the possession of the property prior to this suit and after Fred Corbly had abandoned her, some of which were pending when this suit was brought. She was therefore entitled to the entire relief sought by her bill, including the perpetual restraint of such suits or threatened suits.

The decree of the circuit court is therefore reversed and the cause remanded, with directions to enter a decree in favor of plaintiff in error and against defendant in error in accordance with the views herein expressed.

*Reversed and remanded, with directions.*