Joseph G. D. Bailer, Conservator of Person and Estate of Rosina Schaefer, Incompetent Person, Appellant, v. Joseph McCarthy et al., Appellees.

Gen. No. 41,924.

216

Opinion filed December 30, 1942. Rehearing denied January 20, 1943.

LEON LECOUR DROLET and CHARLES J. REED, both of Chicago, for appellant.

GEORGE R. FITZMAURICE, of Chicago, for certain appellees.

MR. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court.

This appeal seeks to reverse a decree which denied the relief sought by plaintiff, Joseph G. D. Bailer, conservator of the person and of the estate of Rosina Schaefer, an incompetent person, against Joseph McCarthy, the principal defendant (hereinafter for convenience sometimes referred to as the defendant). Certain other parties were made nominal defendants. The decree approved the report and recommendation of the master in chancery to whom the cause had been referred.

Plaintiff's complaint charges that his ward, Rosina Schaefer, was insane on December 10, 1936, when Joseph M. McCarthy, Jr., defendant's son and agent, induced her to sell or exchange a $7,500 note which she owned and which was secured by a first mortgage on defendant's property, for notes aggregating $1,000 which were signed by his father; that she is still insane; and that she was fraudulently overreached in the transaction.

The complaint concluded with the prayer that the entire transaction of December 10, 1936 through which defendant secured Rosina Schaefer's $7,500 mortgage note be declared void and that she be restored to her full and complete rights under said note and an extension agreement of July 18, 1931 between herself and the defendant and his wife.

Plaintiff's theory as stated in his brief is that ''defendant unlawfully procured from his ward a secured note for $7,500 upon which the defendant was liable. That the said defendant gave plaintiff's ward unsecured notes aggregating $1,000 in attempted satisfaction of principal note for $7,500 which consideration is grossly inadequate and unjust and that because of the unsoundness of mind of plaintiff's ward on the date of the alleged contract, December 10, 1936, she was imposed upon and was overreached by the defendant, and the contract, if any, is invalid, and ought to be set aside.''

The theory of the defendant is that ''Rosina Schaefer, though admitting she was a woman advanced in years, was able and did manage her own affairs and was not of unsound mind on December 10, 1936, and that the transaction complained of considering the value of the property in question was fair and reasonable and that no fraud entered into the transaction as complained of by the conservator, and that at no time was there a fiduciary relationship existing between them and the only relationship that ever existed between

them was that of debtor and creditor or mortgagor and mortgagee.''

The master reported as follows pertaining to the issues: ''While the pleadings present two principal questions, namely: First, Was Rosina Schaefer incompetent on December 10th, 1936, the date when she delivered up the Seventy-five Hundred . . . Dollar principal note and mortgage in exchange for the notes aggregating One Thousand . . . Dollars and interest, and second, Was the transaction of such character that the court is justified in finding that Rosina Schaefer was overreached by the defendant and that the entire transaction should be rescinded and set aside and the parties restored to their original position as of prior to December 10th, 1936, evidence was introduced by the plaintiff in support of the *first* proposition only.'' (Italics ours.)

On the question as to the mental condition of Rosina Schaefer the master found ''that plaintiff has failed to prove by a preponderance of the evidence that said Rosina Schaefer was insane at and prior to December, 1936 and the master further finds from all of the evidence that said Rosina Schaefer was not insane in December 1936 or prior thereto, but that she was capable of transacting her own business affairs.''

On the question as to whether Rosina Schaefer had been fraudulently overreached the master found ''there is no evidence in the record supporting the second proposition raised by the pleadings, namely, whether or not Mrs. Schaefer had been overreached in the transaction whereby the Seventy-five Hundred . . . Dollar note and mortgage securing same were delivered up by her in exchange for the twenty . . . Fifty . . . Dollar notes of Joseph McCarthy, Sr., and the right given Mrs. Schaefer to reside in the premises during the remainder of her life.''

It is necessary to set forth the evidence heard by the master bearing upon the mental condition of Rosina

Schaefer somewhat fully. Plaintiff, Joseph G. D. Bailer, testified that he was a nephew of Rosina Schaefer; that he was chief master mechanic at the Wisconsin Steel Works; that Mrs. Schaefer was for many years an alert, active and very exacting business woman; that beginning about July 1, 1933 he visited her three or four times a year and noticed that her memory was not as good as it had been theretofore and that she talked about "things in the past"; that she told him about visits from her husband notwithstanding that the latter died in 1915; that she was confused about when and where her sisters had died although she had attended their funerals; that in September, October, November and December 1936 he visited Rosina Schaefer and noticed that she was getting weaker, was less responsible and that she was confused; that he called upon her on December 11 or 12, 1936, at which time she said to him: "Something has happened to me but I don't know what it is, Mr. McCarthy was here to see me and he took some papers and he gave me some papers."

Martin Bailer who was also a nephew of Rosina Schaefer testified that he was a boiler shop foreman; that he visited her regularly "through the years"; that in the last 10 or 12 years he visited her every couple of weeks; that in July 1936, he noticed that she was very much agitated; that in conversation with her her mind would wander; that she would say "you know, my mother was to see me last night, she was just alongside of the bed. I could just reach out and touch her"; that her mother had been dead for many years prior to that time; that when he visited Rosina Schaefer around Christmas 1936 she was very irrational; and that upon one occasion Mrs. Schaefer told him that defendant's son brought her down to the Continental National Bank where she had her safety deposit box and that after she produced her keys to said box and same was delivered to her McCarthy took

her mortgage papers out of the box and put them in his pocket.

Laura McHugh, a grandniece of Rosina Schaefer, testified that she was a housewife; that she had known Mrs. Schaefer all her life and visited her regularly twice a month for the last 10 years; that in July and August 1936 Mrs. Schaefer talked about visits from her husband, Adolph, who was dead and that she also talked about other things that happened in the past; that on December 12, 1936 she visited Mrs. Schaefer and the latter was very nervous and acted "funny"; and that Mrs. Schaefer told her on that occasion that Mr. McCarthy had taken her to the bank and after giving her a note took two other papers from her safety deposit box.

Frank Fennel testified that he was a coal man; that he knew Rosina Schaefer for 15 years and had visited her twice a month when he delivered coal; that on the occasion of each of his visits he engaged in conversation with her and that among other things she told him about visits from her deceased husband and how he advised her on business problems.

Winifred Bowman testified that she had known Rosina Schaefer since June 1936 and that she had lived with her since November 4, 1936; that from June to November 1936 she lived in an adjoining flat and had occasion to see and talk with Mrs. Schaefer every day during that period; that "she acted very dull, and acted as if her mind had left her"; that she talked repeatedly about interest due her from the defendant and that "it wasn't coming"; that she saw Mrs. Schaefer one hot day in July 1936 when she was unconscious in her kitchen with a fire burning in her stove; that Mrs. Schaefer was up all night looking for some papers on the night of December 12, 1936; that this was after defendant's son had taken her to her safety deposit box; and that on that night after they were in bed Mrs. Schaefer kept saying that her husband

was right at her ear talking to her; and that "Adolph was whispering right in my ear."

The foregoing witnesses testified in plaintiff's behalf. With the exception of Winifred Bowman, they all testified, after relating numerous conversations with Mrs. Schaefer and facts concerning her conduct, as well as the many opportunities afforded them to observe same, that in their respective opinions she was not of sound mind subsequent to the year 1933. Winifred Bowman first became acquainted with Mrs. Schaefer in June 1936. She was with her every day thereafter and since November 1936, she lived with and took care of her. She stated that from her conversations with and observation of Mrs. Schaefer it was her opinion that the latter was not of sound mind since June 1936. It should be stated at this point that, although Joseph M. McCarthy, Jr., testified that in his opinion Mrs. Schaefer was of sound mind on and prior to December 10, 1936, he corroborated plaintiff's witnesses in respect to delusions suffered by her. He testified that she told him "lots of times . . . she told me years back" that she had visits from her husband Adolph; and that "she said he had come at night and that he would hold her hand and advise her on different problems she had." In *Orchardson v. Cofield,* 171 Ill. 14, in defining an insane delusion the court said at p. 35: "An insane delusion is a fixed and settled belief in facts not existing, which no rational person would believe." Mrs. Schaefer's delusions and hallucinations as testified to by the witnesses constitute a most important element in the determination of her mental condition on and prior to December 10, 1936.

In addition to his son defendant presented the following witnesses to testify as to Mrs. Schaefer's mental condition.

Anna Bushea testified that she lived in the same building in which Mrs. Schaefer lived and that she had

seen Mrs. Schaefer three, four or a dozen times but was unable to fix any definite dates or periods as a basis for observation of Mrs. Schaefer's mental condition. She was unable to relate the details of any conversation with her. Over plaintiff's objection she was permitted to testify that in her opinion Rosina Schaefer was sane in 1936, 1937 and 1938.

Edward M. Flavin testified that he was in the business of "liquidating foreclosed banks, making collections, etc."; and that in 1931 he notarized Mrs. Schaefer's signature to an extension agreement and again had occasion to see her in August 1937, at which time he did not enter into any conversation with her but was merely present with McCarthy, Jr., at the latter's request to "just listen to what was going on." His visit in August 1937 occurred after this suit was filed. Over plaintiff's objection that this visit did not afford Flavin any opportunity to form an opinion as to Mrs. Schaefer's mental condition on and prior to December 10, 1936 he was permitted to testify that in his opinion "she was mentally fit in 1937."

Carl Giske testified that he had been employed by defendant as a plumber for 11 years; that he had conversations with Rosina Schaefer in 1935, 1936, 1937, 1938 and 1939. This witness was indefinite in his testimony as to the dates of his visits with Mrs. Schaefer and was unable to relate the subject matter of any conversation with her. Over plaintiff's objection he was permitted to testify that "my opinion is that she had a clear mind. She was always the same that last year [1939] as she was when I first met her [1928]."

Arthur Pazzalli testified that he was a newsboy; that he had delivered the "Abendpost" to Mrs. Schaefer from September 1934 to September 1938; that he saw her on Saturdays when he made collections for the paper and she was able to make change; and that although he had conversations with her he could not tell exactly what they talked about. He gave no opinion

as to the soundness or unsoundness of mind of Mrs. Schaefer but he did state that she always appeared to him to be the same.

A careful examination and analysis of the testimony of defendant's witnesses who stated that in their opinion Mrs. Schaefer was of sound mind during the period subsequent to 1935 discloses that these witnesses did not detail conversations, incidents, facts and circumstances sufficient to warrant the assertion of their respective opinions upon the soundness or unsoundness of her mind. In *Ginsberg v. Ginsberg,* 361 Ill. 499, the court said at p. 507:

" . . . that unless the witness details conversations, incidents, facts and circumstances sufficient to impress the mind of a man of common experience that such witness has a knowledge of the testator's mental condition, and that his opinion is not a guess, supposition or speculation, his opinion should not be received in evidence, citing *Hettick v. Searcy,* 278 Ill. 116, and other cases. (See also, *Britt v. Darnell,* 315 Ill. 385, 400.)"

The medical experts called as witnesses by both sides concurred in the opinion that Mrs. Schaefer was suffering from senile and arteriosclerotic dementia.

Dr. Thomas L. Fentress testified in plaintiff's behalf that he examined Mrs. Schaefer on April 15, 1937, which was about four months after the transaction in question, and that as a result of such examination his diagnosis "was that she was suffering from a senile and arteriosclerotic dementia." He further testified that "very commonly an arteriosclerosis involving the brain would result in dementia by insufficient circulation to the brain . . . insufficient blood to the brain cells, and it would result in damage to the brain cells proper"; and that the "dementia features" of her condition as he found them on the day he examined her "are very insidious, they develop very slowly, and it could easily be ten years or more."

In answer to a hypothetical question which assumed all the material facts in evidence Dr. Fentress testified that in his opinion the woman described in such hypothetical question "was of unsound mind [on December 10, 1936] . . . I would arrive at that opinion by the evidence that you gave that this woman had a definite disturbance in her memory, in the first place. In addition to that, it was stated that she had hallucinations. In addition to that it would seem that there was a defect in the patient's judgment. All of those points would indicate a definite mental disturbance, that she was of unsound mind as you said in that question." In answer to a further hypothetical question the witness stated that in his opinion the woman mentioned in such question did not have "sufficient mental ability to transact ordinary business on December 10, 1936."

Dr. Alfred P. Solomon testified as a medical expert in defendant's behalf. Defendant's counsel propounded to him a hypothetical question which failed to assume many of the material facts in evidence. In answer to such question the witness testified that in his opinion "the hypothetical person was not suffering from arteriosclerotic dementia from the evidence that I have to consider." On cross-examination when he was asked a hypothetical question which assumed in addition to the facts assumed in defendant's counsel's question all the other material facts in evidence bearing upon Mrs. Schaefer's mental condition, in stating his opinion, Dr. Solomon said that "at the time of this examination [by Dr. Fentress] this woman was showing the type of mistakes in judgment and actual anxiety about her weakness which I would thoroughly agree with Doctor Fentress, and from your hypothetical person I would have no question but that she was a senile arteriosclerotic dement."

The rule governing our consideration of the facts herein and our determination as to whether the find-

ings of fact which were made by the master and upon which the decree was based were proper is stated in *Chechik v. Koletsky,* 311 Ill. 433, where the court said at pp. 438 and 439:

"In a chancery case the facts are found by the court, and the master's report, while prima facie correct, is of an advisory nature, only. All the facts are open for the consideration, in the first instance, of the trial court, and in case of an appeal, by the reviewing court. Without regard to the finding of the master upon any particular question of fact, the ultimate and final question in this court is, Was the decree rendered by the chancellor the proper one under the law and the evidence? *Corbly .v. Corbly,* 280 Ill. 278; *Kelly v. Fahrney,* 242 id. 240; *Fairbury Agricultural Board v. Holly,* 169 id. 9."

In our opinion the evidence shows clearly that Mrs. Schaefer was mentally incompetent on December 10, 1936, the date of the transaction in question and for some years prior thereto and that she is still in that condition.

As heretofore shown the master found that there was no evidence in the record to support plaintiff's charge that Rosina Schaefer was overreached in the transaction of December 10, 1936.

The bare facts of that transaction as shown by the documentary evidence relating to same are sufficient in themselves to show that she was overreached. The gross inadequacy of the consideration given Mrs. Schaefer is alone sufficient to brand the transaction as unconscionable. This is not a case where the debtor had become insolvent and the creditor was endeavoring to retrieve as much as possible from one who was in financial distress. In so far as the record discloses the defendant was solvent and there is no good reason suggested as to why Mrs. Schaefer, if she was of sound mind, would consider accepting in payment of the $7,500 that he owed her on her secured note anything

less than that amount. That a sane person would accept unsecured promissory notes aggregating $1,000, which did not even contain a power of attorney to confess judgment thereon and which were signed by defendant, in payment of the $7,500 secured note which defendant was also obligated to pay, is too ridiculous a proposition to merit serious consideration.

We come now to the testimony of defendant's son pertaining to the transaction and it should be borne in mind in considering same that he knew that Mrs. Schaefer's condition precluded her from denying or contradicting anything he said. It should also be borne in mind that during his purported negotiations with her nobody but he and Mrs. Schaefer were present.

Joseph M. McCarthy, Jr., testified that about July 20, 1936, as agent for his father, he called upon Mrs. Schaefer at her home to discuss with her a settlement of her $7,500 mortgage; that he told her that he and his father would either give her a deed to the property or that they would buy her $7,500 mortgage for $1,000; that Mrs. Schaefer told him that she would think it over and let him know; that when he again called upon Mrs. Schaefer in August 1936 she had not made up her mind; that when he called in September, she agreed to accept $1,000 for her $7,500 mortgage but suggested that she preferred that payment of that amount be made to her in notes instead of cash; that he again called upon her in September to negotiate the exchange of her $7,500 note for notes aggregating $1,000; that on that occasion Mrs. Schaefer told him that she was not ready to go ahead with the deal and that she asked him to call later; that he next called upon her in October and because it was late in the day and the bank vault where her papers were kept was closed, he told her that he would come again; that he finally took Rosina Schaefer to the Continental Illinois Bank; that they went to the vault in said bank and

that she took the ''mortgage papers'' out of her safety deposit box and gave them to him; and that he in turn gave her the twenty notes for fifty dollars each which were dated December 10, 1936 and signed by his father.

It will be noted that defendant's son testified that on July 20, 1936, which was about a week after the maturity of the $7,500 note, he offered Mrs. Schaefer in payment of same either a deed to the property or $1,000 in cash. A real estate expert who testified in defendant's behalf stated that in December 1936 the market value of defendant's property, including land and building, was about $2,700 or $2,800; and that the building was in poor condition and its ''life expectancy is probably five years.'' Taxes against the property had been permitted to become delinquent to the extent of $2,856.66 during the period from 1929 to 1936. Thus in proposing to Mrs. Schaefer that she accept a deed to the property in exchange for her $7,500 note defendant's son was offering her something that he knew was worthless since the delinquent taxes exceeded the value of the property.

The testimony of defendant's son that Mrs. Schaefer insisted upon receiving in payment of her $7,500 note, a series of notes aggregating $1,000 rather than $1,000 in cash is not only highly improbable but unbelievable. We cannot believe that she ever agreed to accept $1,000 in any form in payment of her $7,500 mortgage note.

It will also be noted that defendant's son testified that Mrs. Schaefer was to be given her rent free as long as she lived as additional consideration for the sale of her $7,500 note. In our opinion his testimony in this regard is purely an afterthought. Nowhere in his testimony does it appear that he ever mentioned free rent to Mrs. Schaefer or that he entered into either an oral or written agreement with her that she would be permitted to occupy her apartment rent free for the rest of her life. He did not testify that he agreed with her that she would not be required there-

after to pay rent but his testimony was to the effect that he and his father out of sheer generosity decided among themselves that they would permit her to occupy her apartment rent free "as long as she lived." The injection of the matter of free rent could only have been intended to make the transaction, which must have had the appearance even to defendant and his son of being fraudulent on its face, appear a little less fraudulent. All that was given Mrs. Schaefer for her $7,500 note were the notes aggregating $1,000 heretofore referred to. This left a balance of $6,500 of the face value of her note for which no consideration was given. Even though it be assumed that as part of the transaction defendant's son entered into an agreement with Mrs. Schaefer that she would be permitted to occupy her apartment "rent free as long as she lived," which as we have shown was not the fact, she would have to live until she is more than 140 years old before her free rental would equal in amount the aforesaid balance of $6,500 of the face value of her note, not including interest thereon. Then again how could defendant make a binding agreement with Mrs. Schaefer for "free rent as long as she lived" when there was no certainty that he would continue to own the property even for a short time or that it would be fit for occupancy. It must be remembered that the building had a "life expectancy" of only five years. The master was misled into finding that defendant agreed with Mrs. Schaefer to allow her "free rent" as additional consideration for the purchase of her $7,500 note and mortgage.

While *Koch v. Streuter*, 232 Ill. 594, involved an action for specific performance of a contract, we think that the language used by the court in that case is peculiarly applicable to the situation presented in the instant case. There the court said at p. 605:

"If, then, the contract itself is unfair, one-sided, unjust, unconscionable or affected by any other inequitable feature, or if its enforcement would be op-

pressive or hard on the defendant or would prevent his enjoyment of his own rights or would work any injustice, or if the plaintiff has obtained it by sharp and unscrupulous practices, by overreaching, by trickery, by taking undue advantage of his position, by nondisclosure of material facts, or by any other unconscientious means, then a specific performance will be refused.''

We are mindful of the rule that a contract will not be declared void merely because of the advanced age of one of the parties thereto and of the further rule that mere inadequacy of consideration does not furnish sufficient ground for declaring a contract void. However, neither of these rules is applicable to this case. Here the bare facts of the transaction stamp it as fraudulent and the conclusion is irresistible that defendant's son could not have perpetrated this fraud upon Mrs. Schaefer were it not for the fact that she was mentally incompetent. It would be difficult to conceive of a more irrational act than that of Rosina Schaefer in turning over her secured note for $7,500 and accepting in exchange therefor or payment thereof twenty unsecured notes for fifty dollars each, the maker of which was the same person who was obligated to pay her $7,500 note and who, in so far as the record discloses, was solvent and able to pay the $7,500 note.

As has been seen the property in which Mrs. Schaefer lived and upon which she held a first mortgage as security for her $7,500 note had no actual value. Defendant was delinquent as to the payment of said note. He certainly was not apprehensive about the possible loss of the property through foreclosure proceedings since as already shown it had no real value but it is fair to assume that he was apprehensive that a deficiency judgment would in all likelihood be entered against him if Mrs. Schaefer instituted proceedings to foreclose the mortgage securing her note or that judgment would be entered against him in an

action brought by her on the $7,500 note itself. Therefore it is readily apparent why defendant through his son proceeded to procure' the $7,500 note from Mrs. Schaefer by unfair means.

This case presents a rather sordid picture when it is considered that Mrs. Schaefer was 86 years old, physically weak and with her mentality impaired and that defendant's son and agent pursued her until he accomplished his purpose by procuring her note, which was the only resource or means of support that she had in the world, for the grossly inadequate consideration heretofore shown. No other conclusion is possible under the facts and circumstances shown by the evidence than that defendant and his son were actuated by ulterior motives.

We are not only of opinion that the findings of the master as contained in his report and the findings of the decree based on said report are manifestly against the weight of the evidence but it is our further opinion that the decree of the chancellor was not proper under the law and the evidence.

For the reasons stated herein the decree of the circuit court of Cook county is reversed and the cause remanded with directions to enter a decree vacating and setting aside the entire transaction of December 10, 1936 as void. The decree entered by the trial court in conformity with. the views herein expressed shall contain appropriate findings and directions for the restoration of Mrs. Schaefer to her full and complete rights under her $7,500 note, the trust deed securing same and the extension agreement of July 19, 1931 entered into between her and defendant and his wife, Roseanna McCarthy. Such further proceedings may be had as are necessary to fully comply with the foregoing directions.

*Decree reversed and cause remanded with directions.*

FRIEND and SCANLAN, JJ., concur.