*In re* ESTATE OF ROBERT PAYTON, Incompetent.—(JAMES D. GRIFFITH, Special Adm'r of the Estate of Robert Payton, Petitioner-Appellee, *v.* MARTHA PAYTON, Respondent-Appellant.)

First District (4th Division)    No. 79-278

Opinion filed December 20, 1979.

Sophia H. Hall, of Mitchell, Hall, Jones & Black, P. C., of Chicago, for appellant.

James D. Griffith and David H. Pauker, both of Juron, Pauker, Rubin & Griffith, Ltd., of Chicago, for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Martha Payton, respondent, has brought this appeal from the judgment of the circuit court finding that certain transfers of property owned by Robert Payton into joint ownership with her were invalid because Robert was not competent at the time he made the transfers. Respondent contends that she was denied a fair trial on the issue when the trial court: (1) erroneously submitted to the jury verdict forms requiring

them to make a single determination as to Robert's competency; (2) excluded certain testimony on the grounds that it was barred by the Dead Man's Act (Ill. Rev. Stat. 1977, ch. 51, par. 2), and the attorney-client privilege.

We reverse and remand for a new trial.

On February 14, 1978, Robert Payton was adjudged incompetent and Martha Payton, his wife, was appointed conservator of his estate and person. The same day Joseph Payton, Robert's nephew, filed a petition pursuant to article XVI of the Probate Act of 1975 (Ill. Rev. Stat. 1977, ch. 110½, art. XVI), in which he alleged that Robert was incompetent when he transferred certain assets into joint ownership with his wife and when she took out a life insurance policy on his life, paid for out of one of those assets, a checking account. Joseph sought issuance of a citation for the return of those assets and the appointment of James Griffith as special administrator to represent the estate of Robert Payton. Griffith, hereinafter petitioner, was so appointed, the citation to recover assets was issued, and subsequently a jury trial was held.

Although respondent does not challenge the sufficiency of the evidence, resolution of the issues she raises requires a summary of that evidence.

The parties stipulated at trial that the following transactions, occurring between April 5, 1974, and December 31, 1975, were at issue:

1. Transfer of the following bank accounts into joint tenancy with Martha Payton:
  (a) a savings account at Rogers Park Prudential;
  (b) a checking account at First National Bank of Evanston;
  (c) two savings accounts at State National Bank;

2. Transfer of the title to the marital home at 1808 Hovland Court, Evanston, Illinois, into joint tenancy with the right of survivorship between Robert and Martha Payton;

3. Transfer of 15 acres of land in Van Buren County, Michigan, into tenancy by the entirety between Robert and Martha Payton;

4. Transfer of interest in an Investor's Diversified Services Certificate;

5. Application and initial payment of premium on a Continental Western Life Insurance policy on Robert Payton's life.[1]

Petitioner's key witness was Dr. Israel Ziven, whose medical specialty was neurology. He saw Robert and Martha Payton on April 5, 1974. Most of the conversation was with Martha, who told him that Robert had been having trouble functioning, including trouble with his

---

[1] Evidence adduced at trial established the following times for these transactions: (1) all on the same day in the spring of 1974, some time after May 2, 1974; (2), (3) August 26, 1974; (4) July 9, 1975, and (5) April 5, 1974.

memory. The doctor was also told that Robert forgot things easily, misplaced items, and had no apparent anxiety about this. When questioned by the doctor, Robert was able to name the President of the United States and the mayor of Chicago, but did not answer when asked the month, year, and the sum of 16 and 9. Doctor Ziven concluded that Robert did not know the answers to these questions. His initial impression was that Robert was in the intermediate stage of a condition called Alzheimer's disease, a progressive premature brain senility. On his recommendation Robert was hospitalized from April 7 to April 16, 1974, during which period the doctor visited him daily. Based on his observations and the result of a pneumoencephalogram which showed brain shrinkage, the doctor found that his initial diagnosis was confirmed. He saw Robert three more times that year, on May 21, May 28, and July 22. During this period Robert's condition was uniform. It was his conclusion that at that time Robert would not have been cognizant of his actions and behavior and had an impaired ability to function in a normal way. The doctor believed Robert was incompetent during that period, was not in a position to manage his estate and person, and could not make decisions. He projected that his condition would continue to deteriorate with the ultimate result being a complete inability to function or to care for his basic needs. In the stage which Robert had reached by April 1974, the doctor did not expect that he would be capable of dealing with normal affairs on some days and not on others.

Petitioner called a number of witnesses who testified to earlier observations they had made of erratic behavior by Robert Payton. Stanley Grochocimski had been Robert's supervisor at Nicholls Junior High School, where Robert had worked as a janitor. In 1970 and 1971 Robert was punctual, but in 1973 and 1974 he would come in three hours late or two hours early on some occasions. In June 1973 Grochocimski found that he had taken all the wastebaskets and piled them up with trash still in them in a rest room. When he asked Robert why he did not empty them, Robert just looked at him. Once in July 1973 Robert kept washing a single window for 20 minutes. When told to get to the other windows he said nothing and kept washing the same one. Later in the winter of 1973-1974 school authorities had a conference with Robert. He gave them an incorrect home address and also gave several differing answers when asked his age. Several days later he was fired.

Wayne Davis, who had known Robert for 35 to 40 years testified that in the winter of 1973-1974 he observed Robert sweeping his alley. Also that winter on one occasion he saw Robert standing on his porch stairs dressed in pants and a t-shirt with no shoes. When asked what he was doing Robert only said, "I'm Buster, I'm Buster." (Subsequent testimony indicated that Robert was also known by that name.)

Ollie Boyd, the aunt of Robert's first wife, had known Robert since 1935. In the first part of March 1974 she greeted Robert at a currency exchange, but Robert only replied, "I'm Buster, I'm Buster." Later that month she saw him walking back and forth repeatedly on the street. She tried to talk to Robert but he would not answer.

Martha Payton was called by petitioner as an adverse witness pursuant to section 60 of the Civil Practice Act. (Ill. Rev. Stat. 1977, ch. 100, par. 60.) She had married Robert Payton on May 2, 1974. She confirmed that on April 5, 1974, the property at issue was all solely in Robert's name. Some time after May 2, 1974, the bank accounts were placed in joint tenancy. A few months later she and Robert met with attorney Sophie Hall, whom she said was their lawyer, and the deeds were signed placing the real estate into joint ownership. She could not recall what was said at this meeting, although she did recall that Robert was "sort of forgetful" in this period. (The deeds, subsequently introduced into evidence and included in the record on appeal, are dated August 26, 1974.) Without objection petitioner elicited from Martha the fact that in June 1974 Dr. Jacob Fox examined Robert and diagnosed Alzheimer's disease. (Dr. Fox did not testify at trial, nor was any other evidence of this diagnosis presented.) In 1975 Robert was admitted to Downey Hospital and from there he was later transferred to a nursing home.

Also called as a section 60 witness was Sophia Hall, who was one of respondent's attorneys at trial. In May or June 1974 Martha Payton called her and said she and her husband wanted to discuss legal matters. An objection was sustained to the substance of this conversation on the basis that the respondent had not waived her attorney-client privilege. However Hall did testify without objection that they discussed the two real estate parcels at issue. Hall had face to face conversations with Robert Payton in the presence of Martha on two occasions; in June 1974 and on August 26, 1974. Petitioner did not question her concerning the subject matter of the conversations. Hall last spoke with Robert in November 1974.

Before respondent presented her evidence she filed a document waiving her attorney-client privilege as to conversations with Sophia Hall. She also petitioned for permission to waive the privilege on behalf of Robert, or in the alternative sought an order of court requiring petitioner as special administrator to waive the privilege on Robert's behalf. The court found that the decision was for petitioner to make and when he refused to waive the privilege respondent's petition was denied.

Testifying for respondent, Herman Secher stated that on April 5, 1974, he sold Robert Payton the insurance policy at issue. Robert gave

him the information needed for the policy and Secher, who had known him for 15 to 20 years, noticed nothing unusual about him.

Pearl Nails testified that she considered respondent to be her best friend and had known Robert for 29 years. In March 1974 she visited them in their home. Robert conversed with her and she found his behavior normal. In September 1974 she saw him at Downey Hospital. He told her he felt fine and inquired about members of her family by name.

Betty Fletcher testified that in May 1974 while she was working as a teller at the State National Bank in Evanston Robert came to her and asked if she could change his account over to a joint account. She directed him to a bank officer.

Respondent testified on her own behalf. She first met Robert in 1935 and began living with him in 1960. When respondent was asked about a conversation she had with Sophia Hall in the spring of 1974, petitioner objected to that as "something that can't be verified in this case because of the nature of the privilege," apparently a reference to the attorney-client privilege. The court initially sustained the objection but when respondent's attorney stated that they had "found a way on that," respondent was permitted to relate the conversation. (During the colloquy on this objection petitioner's attorney compared the conversation at issue to one with a "dead man" but no objection was made on the basis of the Dead Man's Act, nor was any ruling made on the applicability of the Act.) Respondent testified that she called Hall to tell her that she and Robert wished to make a will. They went to Hall's office in May or June 1974. She recalled that Hall asked about the will, but could not remember what else she said. At this point the court sustained petitioner's objection to testimony about the conversation on the grounds that Robert, who was present at the meeting, had not waived his attorney-client privilege. The jury was instructed to disregard the testimony as to that conversation. Respondent also testified that in the spring of 1974 the accounts at State National Bank and First National Bank were placed into joint tenancy, with Robert signing the documents. In August 1974 he signed the deeds for the real estate in Hall's office.

William Hepker testified that the transfer of the interest in the Investor's Diversified account took place on July 9, 1974. Respondent arranged the appointment and Hepker helped her and Robert prepare the documents. Without further specificity he stated that they said this was what they wanted. They both spoke to him at the meeting but he could not recall who did more of the talking.

At the instructions conference the respondent offered the following instruction, which the court refused:

"In this case the Special Administrator called the respondent

Martha Payton to testify concerning certain things about the property of Robert Payton. The respondent, Martha Payton, however, is not permitted to testify to other things surrounding the transfer."

The proceedings at the instructions conference were not recorded, apparently because the parties did not request a court reporter. However on appeal both parties have provided affidavits concerning those proceedings, which we have accepted as supplementary to the record pursuant to Supreme Court Rule 366 (Ill. Rev. Stat. 1977, ch. 110A, par. 366). Those affidavits establish that at the conference respondent objected to petitioner's verdict forms, which provide for a single finding for petitioner or respondent. Respondent's attorneys argued that these forms were insufficient; that the law required a separate verdict form as to each of the transactions at issue. They also stated that their suggested forms were in the process of being typed. The trial court found that the evidence necessitated only the forms provided by petitioner and also stated that he would not give separate verdict forms. Respondent's attorneys informed the court that they would offer their forms when they were ready so as to establish on the record the judge's refusal to give them. Several minutes after the jury had begun its deliberations respondent submitted three verdict forms: one finding for respondent on all transactions, one finding for petitioner as to the First National Bank checking account, and one finding for petitioner on the Rogers Park Prudential savings account. The judge's notation on each of these is "Submitted—Objected to—Refused as to timeliness."

I.

Respondent's first contention on appeal is that the verdict forms submitted to the jury were erroneous because they did not permit the jury to make separate findings as to Robert Payton's competency at the time of each transaction.

■■ Petitioner asserts that the issue has been waived because respondent failed to submit suggested verdict forms at the instructions conference. But the cases cited in support of this waiver are inapposite, as they all concern instances in which the complaining party apparently failed to voice any objection to an instruction at the instructions conference (*Paulick v. National Bank of Republic* (1935), 279 Ill. App. 160), or failed to indicate that they desired an additional instruction (*Beckstrom v. Montgomery Ward & Co.* (1959), 20 Ill. App. 2d 353, 156 N.E.2d 230; *City of Chicago v. Baird* (1971), 132 Ill. App. 2d 644, 270 N.E.2d 259, *aff'd* (1972), 52 Ill. 2d 512, 288 N.E.2d 110). In this cause respondent specifically objected to petitioner's verdict forms at the instructions conference, arguing that the law required a separate form for each challenged

transaction. Respondent also informed the court that the forms she desired were being prepared. However, the trial court rejected respondent's arguments, stating that it would not give separate forms. Given this unequivocal decision by the court it would appear that actually preparing the proposed forms at that time would have been a futile endeavor (see *Department of Public Works & Buildings v. Association of Franciscan Fathers* (1977), 69 Ill. 2d 308, 371 N.E.2d 616), although the better practice would have been to have the forms prepared for submission at the beginning of the instructions conference.[2] We find that respondent's timely objection to the verdict forms and request for separate forms at the instructions conference, together with the inclusion of the issue in her motion for a new trial adequately preserved this question for review.

██ █ At issue in this cause was the validity of certain transactions in which Robert Payton transferred his sole interest in certain property into joint ownership with respondent without consideration. These transfers were in the nature of gifts. The test of a donor's mental capacity to make a gift is whether *at the time of the transaction* he had the ability to understand the nature and effect of the gift. (*In re Estate of Vardalos* (1974), 24 Ill. App. 3d 520, 320 N.E.2d 568; 38 C.J.S. *Gifts* §13 (1943).) The jury was properly instructed that petitioner claimed that Robert Payton lacked the mental capacity to make these transactions when he made them, thus rendering those transactions invalid. They were also instructed that if they found that ground of invalidity had been proved with respect to a *particular transaction*, they should find for petitioner *with respect to that transaction*. But the jury forms they were given precluded separate findings as to each transaction. The validity of a general verdict is tested by whether it expresses the intent of the jury so that the trial court can understand it and enter judgment thereon. (*Gille v. Winnebago County Housing Authority* (1970), 44 Ill. 2d 419, 255 N.E.2d 904; *Martin v. McIntosh* (1976), 37 Ill. App. 3d 526, 346 N.E.2d 450.) Care must be taken in preparing the verdict form so that it covers every possible finding. (*Garrett v. S. N. Nielsen Co.* (1964), 49 Ill. App. 2d 422, 200 N.E.2d 81.) The forms provided to the jury in this cause allowed them only to make one finding for petitioner or respondent, without regard to what they may have determined as to individual transactions. Thus, we cannot ascertain whether the verdict rendered for petitioner in fact was based on a finding that Robert Payton was competent at the time of each transaction. Although petitioner's evidence tended to establish that Robert was

---

[2] It is noteworthy that section 68(3) of the Civil Practice Act, which sets out the circumstances under which separate verdicts should be rendered, requires procedurally only that they be requested by motion. (Ill. Rev. Stat. 1977, ch. 110, par. 68(3).) The committee comments to that section state that the motion need not be in writing. Ill. Ann. Stat., ch. 110, par. 68(3), Joint Committee Comments, at 7 (Smith-Hurd 1968).

incompetent on April 5, 1974, and every day thereafter because of his disease, respondent presented evidence which tended to negate that conclusion. Thus Herman Secher noticed nothing unusual about Robert on April 5, 1974, when he applied for the insurance policy, one of the transactions at issue. Betty Fletcher testified that it was Robert Payton who asked her about placing his bank accounts into joint tenancy in May 1974. William Hepker testified that he conferred with Robert and Martha on July 9, 1975, concerning the Investor's Diversified certificate and was told that they desired the transfer. Based on this evidence respondent was entitled to verdict forms permitting separate determinations by the jury as to Robert's competency at the time of each transaction.

■■ In *Eggimann v. Wise* (1963), 41 Ill. App. 2d 471, 191 N.E.2d 425, two wrongful death actions against one defendant arising out of an automobile accident were consolidated for trial. Both plaintiffs filed separate counts based on negligence and wilful and wanton conduct. The jury found for plaintiffs based on verdict forms permitting a single finding based on whether or not they found defendant guilty of both negligence and wilful and wanton conduct. On appeal this court reversed that judgment, finding that the forms tended to confuse the jury and did not allow for every possible finding by them. Similarly, in this cause we find that the forms given to the jury tended to confuse them and required incorrectly that they make a blanket finding of competency or incompetency as to all the transactions at issue. Although not cited by the parties, we find support for this conclusion in section 68(3) of the Civil Practice Act, which states:

> "(3) If there are several counts in a complaint, counterclaim or third-party complaint based on different demands upon which separate recoveries might be had, the court shall, on the motion of any party, direct the jury to find a separate verdict upon each demand." (Ill. Rev. Stat. 1977, ch. 110, par. 68(3).)

Although this petition was not formally divided into separate counts, we construe it to have included separate demands for the recovery of certain assets, based on separate transactions wherein the incompetency of the donor had to be separately proved. Accordingly, upon the request of the respondent, the jury should have been instructed to find separate verdicts as to each transaction. Because the failure to do so prevents us from determining the jury's verdict as to each transaction, we must reverse the judgment and remand for a new trial.

## II.

Because of our determination of this issue, we need not reach respondent's second contention that she was denied a fair hearing. And because of the state of the record we do not find that extended discussion

of this issue would be helpful on remand. Thus, although respondent contends that her testimony was barred in part on the basis of the Dead Man's Act, our review of the record establishes that although petitioner made a passing reference to it, no objection was founded on the Act, nor was any ruling made on its applicability in this cause.[3]

Some of respondent's testimony was barred because the court found the attorney-client privilege applicable to conversations between Robert Payton and attorney Sophia Hall in which respondent also participated. But the record does not clearly establish the status of respondent in those conversations: whether she was also a client or was Robert's agent, or simply a third party. Thus we cannot determine whether the privilege was properly invoked in the first instance. Respondent contends that the trial court erred in not requiring petitioner, as special administrator, to waive the privilege. But the cases cited by respondent in support of this claim concern only cases in which the bar asserted was the Dead Man's Act. Respondent has cited no cases specifically concerning the power of the court to require waiver of the attorney-client privilege in any proceeding or specifically in a proceeding such as this one, brought pursuant to article XVI of the Probate Act of 1975. Furthermore, the failure of respondent to make any offer of proof concerning the testimony that was barred prevents us from determining whether the exclusion, if erroneous, was prejudicial. Accordingly, we do not reach this second issue raised by respondent.

For the foregoing reasons, the judgment of the trial court is reversed and the cause remanded for a new trial.

Reversed and remanded.

JIGANTI, P. J., and JOHNSON, J., concur.

---

[3] Respondent has also argued that the court compounded its error in excluding evidence on this basis by failing to give respondent's instruction concerning the limitation of her testimony by this ruling. That argument is vitiated by our finding that there was no exclusion on this basis. Furthermore, by failing to provide this court with that portion of the proceedings at the instructions conference which pertained to this instruction, respondent has waived the issue. *Anderson v. Basham* (1977), 55 Ill. App. 3d 209, 370 N.E.2d 1247.