In re ESTATE OF GUS VARDALOS, Deceased—(BETTY BAGROWE, Adm'r, Petitioner-Appellant, *v.* ALEX GIANNOULIOS, Respondent-Appellee.)

(No. 58113; ▓▓▓▓▓▓)

First District (1st Division)—November 18, 1974.

George C. Rantis, of Chicago, for appellant.

Theodore J. Herst, of Chicago, for appellee.

Mr. PRESIDING JUSTICE EGAN delivered the opinion of the court:

Betty V. Bagrowe, the administrator of the estate of Gus Vardalos, filed a citation to discover assets requiring the appearance of Alex Giannoulios, the respondent. After a hearing, the court found that the decedent had made a gift to the respondent of $7757.61 representing the amount of money in a savings account in the decedent's name. The administrator-petitioner appeals from that finding.

The decedent had been a patient for many years of Dr. Mayo M. Andelson, a certified internist with a sub-specialty in cardiology. Dr. Andelson was called to the Augustana Hospital where the decedent had been admitted in an emergency. His diagnosis was that the decedent had suffered small strokes which resulted in a chronic brain syndrome, which means repeated injury to the brain with loss of function. The decedent was disoriented, agitated, remote and removed. He examined the decedent every day for approximately 3 months and complications subsequently developed. He testified that in laymen's terms the decedent was grossly senile and the functions of his higher brain centers involving his ability to be aware of what was going on were grossly impaired so that one was unable to communicate with him or to have any contact with him. It was Dr. Andelson's opinion that from November 8 until his death in February the decedent was mentally incompetent. When he saw the decedent on November 8, he said, "Hello, Gus, how are you?" and the decedent appeared to know him, but the doctor could not remember if he made an intelligent response.

The petitioner, Betty Bagrowe, is the decedent's daughter. On November 8, 1971, she was on her honeymoon and returned to the city on November 12. She first saw her father at Augustana Hospital on November 15. On that date she saw her cousin, the respondent, and asked him why she or her mother-in-law were not notified. She testified that he told her they wanted to put her father in a nursing home but he did not want to do anything. He asked her if she wanted to "take over" and she said that she would.

She did not see her father every day, but if she did not see him, she would call to ascertain his condition by talking to the nurse on his floor. She never spoke to him over the phone because he was unable to speak. She did not visit him on Thanksgiving or Christmas.

Steve Vardalos, the decedent's brother, testified for the respondent that he and the decedent used to speak by phone every week. They visited each other once or twice a year. His nephew, the respondent, took him to the hospital to see his brother every day for two weeks. The decedent asked if the petitioner ever visited the hospital. Vardalos never saw the petitioner at the hospital. The decedent told him, in the presence of the respondent, "I have some money; I don't know the amount. I want to give it to Alex (the respondent) by promising that if I ever get out of this hospital I want the money back or else he can have it." The decedent told him if he got well he could not live with his daughter because the apartment was too small.

During Steve Vardalos' two-week visit, the decedent acted "all right" and knew him. Based on his "lifetime experiences" with his brother, in his opinion, the decedent did not act "too different" and he "didn't see nothing [sic] wrong with him."

Catherine Horvath testified for the respondent that she had known the decedent for about 30 years. For the last 10 years she had visited or called him two or three times a week. She used to go to his home for dinner and take him for automobile rides. She was the one he called when he got sick, and she visited him daily in the hospital from November 8, 1971, to February 10, 1972. The decedent's brother, Steve, and the respondent were the only family visitors she saw at the hospital. She heard the decedent say that he wanted Alex to get the papers from the bank so that Alex could get authorization to transfer the money to Alex's name. She was present on November 12 when the decedent signed a bank slip transferring the account from his name to the respondent's. In her opinion, his mental condition on that day was normal and he knew her. The day after the decedent signed the paper, she was alone with him. He told her that Alex was like a son to him and that he could rely on Alex if he had a problem. She further testified that there were times when the decedent was confused. She would visit him about 3 hours every day and never saw the petitioner.

The respondent testified that the decedent was his mother's brother whom he first met in 1960 when the respondent came to this country from Greece. He lived with the decedent for 7 years. He transferred the funds to an account in his name the day he received the transfer slip from his uncle.

The legal posture of the case before us is a confusing one. The peti-

tioner did not argue in the trial court that the elements of a gift had not been proved. Her sole contention was that the decedent was "not of sound mind to make any gift." The respondent argued that the decedent had made a gift, but he did not specify whether it was *inter vivos* or *causa mortis*. We are unable to tell from the trial court's remarks what specific finding it was making with respect to the nature of the gift or donative capacity. The brief filed by the petitioner contends that no gift *inter vivos* was proved. The respondent's brief cites no authority to support a finding of gift *inter vivos* but he argues that the evidence establishes a gift *causa mortis*. No reply was filed by the petitioner, nor did she in oral argument submit any authority on the issue of gift *causa mortis*. We conclude, therefore, from the briefs and the oral arguments that it is conceded that the evidence does not establish a gift *inter vivos*. The respondent has not argued that the petitioner has waived the right to contest the sufficiency of the evidence to establish a gift *causa mortis* by her failure to raise the question in the trial court or in this court. That being so, we will address ourselves to that question.

■■ A gift *causa mortis* is effected only if the following conditions are met: The donor must be stricken with some disorder which makes death imminent (*Taylor v. Harmison*, 79 Ill.App. 380, affirmed, 179 Ill. 137, 53 N.E. 584); death of the donor must ensue as a result of the disorder existing at the time the gift was made without any intervening perfect recovery (*In re Estate of Brokaw*, 339 Ill.App. 353, 90 N.E.2d 300); the gift must have been made to take effect only in the event of the donor's death by his existing disorder (*In re Estate of Meyer*, 317 Ill.App. 96, 45 N.E.2d 495); and there must have been an actual delivery of the subject of the donation to the donee. *Williams v. Chamberlain*, 165 Ill. 210, 46 N.E. 250.

■■ The burden of proving a gift *causa mortis* is on the alleged donee, and the general rule requires that it be proved by clear and convincing evidence (*In re Estate of Palmer*, 326 Ill.App. 254, 61 N.E.2d 289). However, less positive and unequivocal proof is required to establish a gift *causa mortis* to a relative than to persons not related to the donor, and slight evidence will suffice where there is no evidence of fraud or undue influence. (*First National Bank v. O'Byrne*, 17 Ill.App. 473.) In this case, fraud or undue influence were not pleaded or argued.

■■ Whether the respondent sustained his burden of proof was for the trial court to determine, and we may not reverse his holding unless it can be said that it is manifestly against the weight of the evidence. (*Schulenburg v. Signatrol, Inc.*, 37 Ill.2d 352, 226 N.E.2d 624.) The fact-finder could reasonably infer that the decedent was suffering from a disorder which caused his death and that he was aware of the gravity

of his condition. The factfinder could also conclude from the testimony of two apparently disinterested witnesses, Steve Vardalos and Mrs. Horvath, that the decedent made a delivery of the property by giving the respondent the transfer slip and that the gift was subject to revocation only upon the occurrence of a condition subsequent: his recovery. It thus appears that all of the elements of a gift *causa mortis* had been sufficiently proved.

■■■ Finally, the petitioner contends that the respondent has failed to prove the mental competency of the decedent but has cited no cases in support of her argument. The petitioner, we believe, misconceives the burden of proof. The same degree of mental capacity is required to make a gift *causa mortis* as is required to make a will; if a person is competent to dispose of property by will, he may effectually dispose of it by gift *causa mortis*. (38 C.J.S. *Gifts* § 76 (1943).) As in the case of a will, the test of mental capacity to make a gift is whether at the time of the transaction the donor has the ability to understand its nature and effect. (38 Am.Jur.2d *Gifts* § 12 (1968).) The law presumes every man to be sane and of sound mind until the contrary is proved, and the burden rests upon the party who asserts it to prove lack of testamentary capacity. (*Shevlin v. Jackson*, 5 Ill.2d 43, 47, 124 N.E.2d 895.) Sickness and infirmity alone do not show lack of testamentary capacity, nor does an unreasonable prejudice against a natural object of one's bounty necessarily do so. *Sloger v. Sloger*, 26 Ill.2d 366, 369-70, 186 N.E.2d 288.

What motivated the decedent to give the property to his nephew rather than his daughter we, as a reviewing court, may only speculate about. The controlling fact is that the trial court heard evidence from which he could infer that the gift stemmed from avuncular affection. The respondent had been brought from Greece by his uncle and had lived with him for 7 years. It was he who visited the decedent everyday in the hospital while his daughter, the factfinder could conclude, never visited him. By her own testimony she did not visit him on Thanksgiving or Christmas.

■■■ The court heard the expert witness who testified for the petitioner and the two lay witnesses who testified for the respondent. What weight the court was required to give the testimony of the physician is answered in *Tyler v. Tyler*, 401 Ill. 435, 440-41, 82 N.E.2d 346:

> "The rule is that a person who is not an expert may give his opinion concerning the mental capacity of a testator if it appears that such witness has an acquaintance with the person whose competency is in question and relates facts and circumstances which afford reasonable ground for determining the soundness or unsoundness of mind of such person, and that the value of the

opinion so expressed is such as the capacity, intelligence and observation of the witness who forms it may warrant. (*Ergang v. Anderson*, 378 Ill. 312.) While physicians are better qualified to testify to a diseased condition than are laymen, their testimony upon the subject of the mental capacity of an individual whom they have been privileged to observe is not entitled to any greater weight than that of laymen. (*Nadenik v. Nadenik*, 372 Ill. 408.)" Obviously, the trial court believed the lay witnesses, and it is not for us to say that it should not have done so. We judge, therefore, that the finding of the trial court that the petitioner had failed to rebut the presumption of donative capacity on the part of the decedent is not against the manifest weight of the evidence. The judgment of the circuit court is affirmed.

Judgment affirmed.

BURKE and GOLDBERG, JJ., concur.