BERNARD BARTH, by Charles S. Werr, Conservator of the Estate of Bernard Barth, Incompetent, Plaintiff-Appellant, *v.* GORDON C. GREGORY *et al.*, Defendants-Appellees.

Third District   No. 78-50

Opinion filed November 9, 1979.—Rehearing denied January 22, 1980.

Harry Leinenweber, of Dunn, Stefanich, McGarry & Kennedy, Ltd., and Frank Reynolds, of Reynolds & Reynolds, both of Chicago, for appellant.

Thomas R. Wilson, of Joliet, for appellees Gordon C. Gregory, Florence Gregory, and E. C. Gregory & Company.

Nadelhoffer, Hennessy, Dommermuth & Brestal, of Naperville, and Thomas, Wallace, Feehan & Baron, of Joliet, for appellees Albin Dommermuth and Richard F. Condon.

Keith Roberts, of Donovan & Roberts, of Wheaton, for appellees Macom Corporation and Oliver-Hoffman Corporation.

Mr. JUSTICE BARRY delivered the opinion of the court:

The plaintiff, Charles S. Werr, conservator of the estate of Bernard Barth, an incompetent, succeeded to an action originally brought by Barth in the Circuit Court of Will County to rescind a land sale agreement and to reconvey real estate deeded to a land trust on the ground that at the time of these transactions Barth was incompetent and unable to comprehend the nature and effect of his actions. The plaintiff also sought compensatory and punitive damages from the defendants on the grounds that they had entered into a conspiracy to defraud Barth of his property. In a bench trial, the court found for the defendants on all counts and entered a judgment for $11,065 on defendant Naperville National Bank & Trust Company's counterclaim for attorney's fees. It is from these judgments that plaintiff appeals.

On December 29, 1975, Barth, a 72-year-old widower, represented by attorney Albin Dommermuth, executed a deed conveying his 77½-acre farm to a land trust which was created by an instrument executed contemporaneously. The Naperville National Bank & Trust Company was the trustee under this trust, designated as Trust No. 7-433. This

transaction was orchestrated by the real estate brokerage firm of E. C. Gregory & Co. of Naperville, Illinois. Under the terms of this trust the power of direction was in the settlor, Barth, and upon his death the interest was to pass to designated beneficiaries of another trust, the "Bernard Barth Trust," which, contrary to the provision of the trust agreement, was not yet in existence. Present when these documents were executed in the office of Gordon Gregory of E. C. Gregory & Co. were Gordon Gregory, Everett Gregory, Dommermuth and Barth.

On January 9, 1976, Barth executed a letter of direction, drafted by Dommermuth, to the land trustee directing the trustee to sell the *res* of the trust (Barth's 77½-acre farm) to the buyers that E. C. Gregory & Co. had procured, *i.e.*, the Macom Corporation and the Oliver-Hoffman Corporation (who were beneficiaries of another land trust, Trust No. 7-437, in which the Naperville National Bank was also designated as trustee). The land-sale contract was executed on January 13, 1976. Under this agreement, Barth was to receive a total of $400,000 for his farm, with a $50,000 down payment, and the remainder payable in monthly installments of $2,819.60 over 20 years. The terms of the contract provided that Barth was to receive $10,000 upon the execution of the contract, and another $40,000 within 10 days after a tender of commitment for title insurance. Pursuant to a listing agreement between Barth and E. C. Gregory dated December 22, 1975, a $24,000 broker's commission was to be paid out of this $50,000 down payment.

On February 27, 1976, Barth executed a will and simultaneously an intervivos pour-over trust, the "Bernard Barth Trust" to which we have heretofore referred. Under the trust provisions, said Gordon Gregory and a Gus Pakosta were the beneficiaries of the land trust upon Barth's death. The wives of Gregory and Pakosta were made secondary beneficiaries.

The first issue that we will deal with concerns the plaintiff's allegation that on December 29, 1975 (the day Barth executed the deed and Land Trust No. 7-433 agreement), and January 9, 1976 (the day Barth executed the letter of direction to the land trustee), Barth did not have the requisite mental capacity to execute the pertinent documents. If our review of the evidence presented before the trial court reveals it to be insufficient to justify the court's decision, and as a consequence we find that Barth indeed was mentally incompetent and therefore unable to comprehend the nature and effect of his actions at the times the documents were executed, we must rescind the land sale contract of January 13, 1976, and order the reconveyance of Barth's property by the land trust. A detailed recitation of much, though not all, of the testimony is necessary to our consideration of Barth's requisite mental capacity and whether the trial court's finding in this regard was against the manifest weight of the evidence.

Two medical doctors testified on behalf of the plaintiff, and a third doctor's medical findings were stipulated into the evidence. The first doctor to testify was Donald Carducci, who had been Barth's regular physician since 1963. On December 1, 1975, Barth was brought to Dr. Carducci's office by one of the co-defendants in this case, Gus Pakosta, a Naperville barber and recent acquaintance of Barth. During the course of his relationship with Barth, Pakosta had observed the rapid deterioration of Barth's mental and physical condition (which will be discussed subsequently), and saw in this deterioration an opportunity to be made the primary beneficiary of Barth's will. On November 24, 1975, Pakosta took Barth to the office of Ralph Gust, a Naperville attorney, for the purpose of having Barth's will drawn by which he would leave the entirety of his estate (including his farm) to Pakosta and his wife. Gust, however, came to the conclusion after initially drawing the will that Barth lacked testamentary capacity, and he told Pakosta that unless he (Pakosta) obtained a statement from a doctor that Barth had the requisite mental capacity to execute a will, he would not allow the proposed testator to sign. Pakosta then brought Barth to Carducci's office in the hope that he would receive a favorable report from him regarding Barth's mental makeup.

In his examination of Barth, Carducci found that he suffered from diabetes mellitus, generalized arteriosclerosis, and cerebral arteriosclerosis which was causing a mental senility manifested by a lack of orientation as to time and place. When Carducci examined Barth, Barth did not know the month, date, or year. He was unable to tell Carducci the name of the president of the United States, and in fact stated that there had been no president since the assassination of John F. Kennedy. On the basis of this examination, Carducci concluded that Barth was, at least at times, incapable of managing his own affairs, and incorporated his findings in a letter dated December 1.

On cross-examination, Carducci admitted that Barth could have lucid intervals during which time he could be quite rational. However, Dr. Carducci further stated that the probability of lucid intervals was greater in familiar surroundings than in unfamiliar surroundings, where an individual in Barth's condition might get "all confused." He stated that in his opinion, a lawyer's office, the office of a bank trust officer, or the office of a real estate broker that Barth had not been in prior to December 1, 1975, could not be considered to be familiar surroundings, although Barth could have gained familiarity with them in lucid moments. Dr. Carducci further testified that in his opinion the lucid intervals could last for "periods of time," but he had his doubts that such periods could last for days. In response to the question of whether Barth could be lucid and "clear as a bell" from eight o'clock in the morning until noon on any one

day and be able to transact business during that period, Carducci replied that he could but also said "I don't know about if he could have a lucid moment lasting that long \* \* \*." In his opinion, Barth's overall mental condition would not improve.

The second doctor to testify at trial on behalf of the plaintiff was Dr. Richard Gallagher, a psychiatrist. Gallagher examined Barth on June 24, 1976, at the request of Margaret Werr, a second cousin of Barth and sister of the plaintiff/conservator. Gallagher testified that when he examined Barth he found that although his consciousness was not impaired, he was disoriented as to time and place. Barth's memory, particularly his recollection of immediate events, was also "grossly impaired." Barth could remember events occurring many years ago, but was unable to recall events occurring within a past few minutes, hours, or days.

In the course of his examination, Dr. Gallagher made observations with respect to Barth's intelligence and thinking ability. He found that Barth was unable to make a simple calculation which involved the use of anything more than rote memory. He further found that Barth's judgment was impaired, although he stated that it was difficult to render an opinion on this subject without relying on a history of the patient.

Based upon his observation of Barth, Dr. Gallagher's medical opinion was that Barth was suffering from organic brain syndrome. Dr. Gallagher defined organic brain syndrome as a mental condition involving disturbances in the higher cortical functions of a person. As a result of these disturbances, he has difficulty planning and executing purposeful behavior. Gallagher further stated that Barth's condition was chronic (i.e., partially irreversible) and was moderate in degree (did not require institutionalization).

Dr. Gallagher was asked to respond to two hypothetical questions. In the first, Dr. Gallagher was asked to give his opinion on how long Barth had suffered from organic brain syndrome, given the findings of Dr. Carducci on December 1, 1975. Gallagher replied that his opinion was that Barth's condition "must have existed at least from that date to the time that I saw him, and probably long before that." The second hypothetical recited, *inter alia*, Barth's medical history since 1972, the findings of Doctors Carducci, Gallagher, and Buencafino (whose findings are hereinafter recited), and the recent condition of Barth and his home. On the basis of the hypothetical, Dr. Gallagher's opinion was that Barth was incompetent on December 29, 1975, January 9, 1976, and February 27, 1976.

Dr. Arnesto E. Buencafino had examined Barth on April 9, 1976, in order to evaluate his diabetic status. The following findings of Dr. Buencafino were stipulated to by all parties and admitted into evidence:

1. Fatty liver with jaundice due to alcoholism

2. Acute pancreatitis
3. Hyperlipemia, type IV
4. Alcoholic hepatitis
5. External hemorrhoids, infected
6. Diabetes mellitus
7. By x-ray, lower left lobe pneumonia.

The testimony of Dr. Carducci and Dr. Gallagher, supplemented by the stipulated findings of Dr. Buencafino, clearly favored the plaintiff's contention that Barth was incompetent on the days that the pertinent documents were executed.

The only medical evidence that is in any way favorable to the defendants was a letter from a Dr. F. Wayne Hollinger, dated December 16, 1975, a copy of which was introduced into evidence. Apparently, Gus Pakosta took Barth to Dr. Hollinger after receiving the unfavorable medical report from Dr. Carducci regarding Barth's mental capacity. The letter from Hollinger states that after examining Barth, he was found to be "of sane and sound mind and both physically and mentally capable of signing a legal document." However, there are several factors which cause us to seriously question the credibility of this letter. Pakosta testified that he was told by a friend of his that if he went to Dr. Hollinger he would get a favorable report regarding Barth's competency. Pakosta further testified that he was billed five times the normal price for the examination, and the doctor did not impress him "one bit." In light of this testimony, and in light of the fact that Dr. Hollinger was never called upon to testify by the defendants, we believe that this letter lacks credibility and is not to be given much weight.

In addition to the medical testimony presented by the plaintiff, testimony for the plaintiff was also given by laymen, including attorney Gust and four Naperville policemen, in support of plaintiff's contention that Barth was mentally incompetent. Gus Pakosta, one of the defendants in this case, was called as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60). He testified that he had become acquainted with Barth in August of 1975. Shortly after the middle of August, he visited Barth's house for the first time, and became aware of the deplorable condition of Barth and his home. Pakosta testified that the house was dirty, dishes were scattered over the floor in the kitchen, and located just outside of the house was a big pile of garbage. Barth would wear the same pair of pants day after day. His eating habits were poor, and beginning the end of August, Pakosta began to bring Barth food.

Until January of 1976, Pakosta saw Barth on a regular basis, sometimes visiting as often as four or five times a day. Pakosta testified that during these November and December visits the odor inside Barth's house was "very, very terrible." He would often find the floors of the

house full of human excrement, particularly the floors in the kitchen and the main bedroom. Human waste could also be found outside of the house, as Barth would defecate outdoors when the weather was warm. ("You kind of had to watch where you were walking or else you would walk all over it," Pakosta said). Barth himself would often have feces on his pants and underwear.

Pakosta further testified that in November and December of 1975 Barth's toilet was not functioning and due to the lack of water pressure in his home Barth was unable to bathe himself. The supply of heat to his house was sporadic. As concerns Barth's eating habits, Pakosta testified that Barth never cooked for himself during these months. In fact, towards the end of August, Barth had begun to discard all of his pots, pans, and cooking utensils into a pile outside of his house. Some of the pots and pans appeared to have holes in them which might have been made by a hatchet. Although Barth sometimes had lunchmeat in his refrigerator, he seldom had canned or fresh fruits or vegetables in the house. His refrigerator, however, was well-stocked with brandy and beer. Pakosta testified that he observed dozens of beer cans in Barth's refrigerator, some a quarter empty. During November and December, Barth always appeared to have been drinking.

Beginning the first week in November, through the second week in December, Barth would call Pakosta 10 to 25 times a day at his home. On one day he called Pakosta 45 times. Barth would not make much sense on the telephone. Pakosta stated that when Barth called in the first or second week of December, Barth didn't know what to say to him. Pakosta would ask him what he wanted, and after responding "Oh, nothing", Barth would hang up. Five minutes later Barth would call again. Many times Barth would simply hang up on Pakosta without ending the conversation.

Pakosta testified that Barth was in the habit of signing checks for Pakosta after he had written the amount and the name of the payee on the check. Pakosta stated that from the beginning of December until February of 1976, he did this at least on four occasions. Pakosta further testified that in Barth's living room was a tray in which he had at least $2,000 in cash.

On the basis of his observations of Barth and his contacts with him in the latter part of 1975 and the first few months of 1976, Pakosta was of the opinion that Barth's mental condition was "bad." He stated that he never saw any improvement in Barth's condition, although he did admit there were times when Barth would appear to be rational. The defendants endeavored to attack Pakosta's credibility and impeach him as a witness by prior inconsistent statements, particularly statements made in a letter of May 12, 1976, which was written by Eunice Pakosta, signed by Gus Pakosta, and sent to the clerk of the circuit court after the Pakostas had

been served with summons. The defense pointed out that many of the statements in the letter conflicted with portions of Pakosta's testimony relating to Barth's condition, as well as with statements made in pretrial depositions. However, various disinterested witnesses corroborated Pakosta's testimony. The first was Terry Robertson, who had known Barth for 7 or 8 years and at one time had been a close friend. He saw Barth in June of 1975, and did not see him again until a few weeks prior to Christmas of that year. When he arrived at Barth's house on this latter date, he found the smell "unbearable." Human excrement was swept across the front porch, and when Barth finally answered the door (after some time of knocking and beating) he was wearing "long-handled underwear" on which there was human excrement. In response to a question as to whether Barth recognized him on this occasion, Robertson said,

> "I say vaguely at times he did, but he seemed like he was coming—his mind was coming and going. It was not the same Barnie as I stated before that I had known pretty [sic] summer before Christmas came up. His condition was real bad."

Robertson further testified that Barth's house was in deplorable condition. "I don't know what type of people would live in a place like that," Robertson said. "The conditions, I don't see how anybody human could live that way."

After his initial December visit, Robertson visited Barth weekly (usually on weekends) until February or March of 1976. On these occasions Barth had the odor of alcohol on his breath, and was inevitably disoriented (Robertson testified that "I don't think he knew what he was doing or where he was").

Robertson visited Barth for the third time in the last week of December of 1975. After being asked by plaintiff's counsel to describe Barth's condition on that occasion, Robertson said:

> "The same as he just wasn't stable at all. He could not remember; his mind had just drifted. He could not hold his mind to one thing. He would start on it then it would just drift just like it just went out [snapping fingers] just like that.
>
> Q. Would you be able to carry on conversation with him at that time?"
>
> A. Just bits and pieces, that is all."
>
> Q. What if anything did you observe about the condition of his clothing?"
>
> A. His clothing, like I said, it had human waste all over them.
> * * * "

Robertson further stated that Barth's refrigerator was always full of beer and brandy, thus corroborating Pakosta's testimony in this regard.

Robertson stated that on one occasion when he was at Barth's home the first or second week in January, he saw Gordon Gregory leave the farm with Barth and return some time later with a "big sack of beer and booze" containing at least two or three six-packs of beer. On subsequent visits to Barth's house, Robertson testified that he found no change in Barth's condition and "if anything, it would have got worse."

As previously stated, four Naperville policemen also testified that on the basis of their numerous contacts with Barth, they believed him to be mentally incompetent. The first officer to testify was Robert Kouba. Kouba's first contact with Barth was in the second week of October 1975. He testified that when he arrived at Barth's home, he saw Barth walking along the side of his house wearing only thermal underwear and carrying a roll of toilet paper. Kouba also saw refuse all about the house's exterior. The second time Officer Kouba had the occasion to visit Barth's home was the second week in December, when he was to serve him with a notice to appear. (On November 19, 1975, Barth had been arrested for public intoxication.) On this occasion, Kouba entered Barth's house and had an opportunity to view Barth's living conditions. Kouba testified that he found the kitchen to be "extremely filthy." The stove did not function, and the sink looked as though it had not had water in it for some time. Located on the kitchen table was a jar of peanuts, the lid of which had holes punched into it ("like someone was attempting to open the jar instead of unscrewing it. They were trying to rip it open.") The only food he found in the kitchen besides the peanuts was a plastic container of oranges. In Barth's refrigerator Kouba found about a dozen beer cans, some of which were only partially full. Human excrement was smeared on the kitchen floor, and there was an odor of human waste in the air. In his conversation with Barth, he noted that Barth did not appear as coherent as he did on their previous meeting, and Kouba had difficulty making him understand the meaning of the notice to appear and the concomitant legal obligations.

Several days later, Kouba, accompanied by a female representative of FISH (a helping-hand organization), again visited Barth's home. When Barth answered the door, he was wearing his thermal underwear, in which he had defecated, around his knees. Kouba entered Barth's house and attempted to find some clean clothing. In the living room Kouba found soiled clothing piled about. The kitchen was in the same condition it was in on his previous visit. Again, the odor of human waste was present.

Kouba endeavored to explain to Barth the purpose of his visit, which was to ascertain Barth's needs. However, Kouba found Barth not to be mentally alert, and Barth in fact seemed "baffled" by Kouba's appearance. In addition, although Kouba had been to Barth's house just a few days

previously to serve Barth with the notice to appear, Barth did not recognize him.

Donald Million, Guy Fraley and Bart Robbins were the other three Naperville police officers who had contacts with Barth in late 1975. Their testimony concerning Barth's mental and physical condition on the occasions they saw him was essentially the same, and consistent with the testimony of Pakosta and the disinterested witnesses who testified on plaintiff's behalf. On every occasion Barth was confused and disoriented, unaware of what he was doing and what was going on around him. On November 15, for example, Barth was observed sitting in his car by the officers in downtown Naperville. At the time he was wearing only one shoe, socks and a shirt, and had his legs placed inside the sleeves of his coat. Although he was charged with public intoxication because of his conduct and appearance on this day and at least one other occasion, each of the officers testified that upon reconsideration they believed Barth's problem was more serious and complex than simple drunkenness. When Officer Fraley was asked by plaintiff's counsel why he had charged Barth with intoxication on November 15, he replied, "I certainly felt that Mr. Barth needed some form of help at that time. I felt that he shouldn't be allowed back on the street for his own self-being [sic]."

The final witness for the plaintiff whose testimony concerned Barth's mental condition was John A. Werr, a second cousin of Barth. Werr testified that on February 10, 1976, he and his sister, Margaret Werr, visited Barth. They found Barth to be confused, disoriented and "obviously very ill." When Barth answered the door he was wearing two overcoats pinned together in the front and nothing on underneath. The condition of his house was deplorable. The kitchen door was broken, several windows were broken allowing cold air in, and "the house was filled with urine, vomit, excretion." The stove did not operate. There was no water available, and as a consequence the toilet did not function. There was no food in the house. In the refrigerator were three bottles of brandy and some beer cans. On subsequent visits, the Werrs found Barth's condition and the condition of his house to be basically the same. Werr testified on cross-examination that on none of these occasions did he detect alcohol on Barth's breath.

Besides Gus Pakosta, the plaintiff also called most of the other defendants to testify as adverse witnesses under section 60. Naturally, most of the testimony given by these adverse witnesses regarding Barth's mental competency contradicted the testimony we have outlined so far. Defendant Gordon Gregory of the real estate brokerage firm of E. C. Gregory and Co. had been an acquaintance of Barth since 1971, but in the years prior to 1975 had seen Barth only occasionally. According to

Gregory, it was in October of that year that Barth first indicated to him that he was interested in selling his farm. Gregory subsequently met Barth on several occasions to discuss a possible sale, and from early December until the middle of March took Barth to lunch three or four times a week. Gregory stated that there was nothing unusual or out of the ordinary at Barth's house in late 1975, and did not detect any odor in the house during his visits in November and December. When asked to describe the condition of Barth's house in late January and early February of 1976, Gregory at first stated that it was "pretty much the same" as he had described in his previous testimony. However, he later retracted that statement and stated that "it probably was messed up a little more." Asked what he meant by this, Gregory stated that "there was a lot of snow on the ground and every time you would walk in the house would track stuff in and there were times when he had various kinds of papers laying on the floor." Gregory was questioned further on the condition of Barth's home:

"Q. How about any human waste, was any of that on the floor?

A. In one room, there was some at times.

Q. And what room was that, sir?

A. That is a room that we—he had trouble—that was the only room in the house where he had trouble heating.

Q. That was in the bedroom?

A. Yes.

Q. Were the inside toilets working at that time?

A. I was able to make them work at times.

Q. You were able to make them work at times, that to imply that they would not work at other times?

A. Well, he couldn't flush the toilet every day, and expect it to work. I would put water in the flushtank and then it would work.

Q. Okay. Did you detect any odor in the house?

A. No, I never."

Gregory stated that prior to late January and early February of 1976, he saw Barth cook for himself on various occasions, but not after January 10. He testified that by late January and early February there was no evidence that Barth was cooking, and the pots and pans that were in the house appeared as though they had not been used recently. Gregory further testified that the first time he looked in Barth's refrigerator was in December of 1975. He stated that because Barth was a great lover of fruit, his refrigerator would always have fruit and milk in it. In his kitchen he would have bread, jelly, peanuts and peanut butter. Asked whether there was brandy and beer in the kitchen in late January, Gregory acknowledged there was, but stated it was "unusual" to see any more than two open cans in the refrigerator at any one time.

Gregory and Barth met defendant's attorney Albin Dommermuth on several occasions. On December 15, Gregory and Barth met with Dommermuth at Gordon Gregory's office to discuss the legal work Dommermuth was to perform for Barth. On December 22, a second meeting was held at Gregory's office, at which time Barth signed two documents; a listing agreement with E. C. Gregory & Co. and an agreement to pay the brokers a commission of $24,000. Gregory testified that at this meeting Dommermuth explained to Barth the meaning of the various paragraphs of the listing agreement, which did *not* contain the proposed price per acre of the farm nor the total purchase price. On December 29, Gregory and Barth went to Dommermuth's office to execute the deed and land trust agreement. Gregory testified that he didn't know how long this meeting lasted, and in fact did not recall the primary purpose of that meeting. Asked to describe Barth's appearance on that occasion, Gregory stated "Everytime I was with him, he was dressed up in clean farmer type clothes." Gregory stated on three or four occasions he took Barth's clothes home to be laundered. With regard to Barth's awareness in December of 1975, Gregory said "Everytime I was with him, he impressed me with being a very sharp-minded man." According to Gregory, Barth was oriented as to time, date and place. He knew who the president was, and was aware of current events because he would pick up a newspaper at least a couple of times a week. Gregory further testified that from the first time he met him until March 15, 1976, he was in "good" condition and during this period of time never noticed a change in Barth's mental awareness. "He knew what he was doing. I always felt that he knew what he was doing. * * *. Because of the remarks he would make. He was very sharp," Gregory said.

Albin Dommermuth, the attorney, testified he first met Barth in early December of 1975, when Gordon Gregory brought him to his office. He stated that he had a short conversation with him at the time, but did not recall any discussion relating to the legal work involved in selling the farm. At this meeting, Dommermuth stated that Barth seemed "perfectly well and able." Concerning his mental awareness, Dommermuth said, "I thought he was alert at the time. He knew what he was talking about and he was responsive to everthing I said."

The next time Dommermuth saw Barth was December 29. Prior to the meeting, Dommermuth had been informed by Everett Gregory that the details of the sale had been worked out with the prospective purchasers. Consequently, Dommermuth drafted a deed and a land-trust agreement in which the Naperville National Bank was designated as trustee, and brought them to the meeting at Gordon Gregory's office. Present at this meeting were both Everett and Gordon Gregory, Barth, and a secretary to Gordon Gregory. Dommermuth testified that at the

meeting he explained to Barth how the sale would be accomplished in three phases (conveyance to bank in trust; execution of sale contract; creation of *inter vivos* trust). Dommermuth further testified that although Barth seemed "impatient," and "wanted to get the deal over with," he was alert. "I didn't see nothing wrong with the man."

On January 6, Dommermuth went over the proposed land sale agreement with Barth at Everett Gregory's office. The discussion with Barth lasted 15 or 20 minutes. Dommermuth stated that at this meeting Barth said little more than that he agreed to the terms of the proposed contract. The next meeting occurred on January 9. At this meeting Barth agreed to the draft of the land sale agreement. Dommermuth recalled telling Barth that under the terms of the contract it would take 20 years for final payment, and Barth responding that he would be dead by then. That is all that Dommermuth recalled Barth saying at this meeting. Dommermuth said in subsequent meetings with Barth (including a meeting on February 27, when Barth executed his last will and testament), Barth seemed mentally aware of what was happening.

Defendant Richard Condon is a trust officer of Naperville National Bank. In this capacity, he met Barth on several occasions, and always found him to be "mentally sharp and agreeable." Unlike Gordon Gregory and Dommermuth, he did not see Barth on the days the deed and land trust and the direction to sell were executed. However, Condon was present on February 27, 1976, when Barth executed his will at Condon's office. On this occasion Condon found Bernard Barth to be "very alert, * * * agreeable and affable."

Everett Gregory, Gordon Gregory's brother, did not testify about Barth's mental condition. Ronald Richardson, a former employee of Naperville National Bank, was the only disinterested witness to testify on behalf of the defendants. He testified that he had two conversations with Barth, one over the telephone and one in person. Richardson testified that when he saw Barth just prior to February 19, Barth was dressed in casual clothes and that his voice had a normal speaking tone; slow, deliberate and calm.

■■ To have the sale rescinded, the plaintiff has the burden of proving that on the particular dates in question, *i.e.*, December 29, 1975 (the day Barth executed the deed and land trust agreement), and on January 9, 1976 (the day Barth executed the letter of direction to the land trustee to sell), Barth was incompetent and unable to tend to his own affairs. "The test of mental capacity to make a conveyance is that one must have a sufficient mind and memory to comprehend the nature and effect of the act in which he is engaged. Impairment of mind incident to old age and disease or eccentricities will not render the conveyance invalid so long as the grantor is able to comprehend the nature of the transaction and

protect his own interests." (*Kolze v. Fordtran* (1952), 412 Ill. 461, 469, 107 N.E.2d 686, 690; Accord, *Eslick v. Montgomery* (1972), 3 Ill. App. 3d 447, 278 N.E.2d 412.) In *Redmon v. Borah* (1943), 382 Ill. 610, 620, 48 N.E.2d 355, 359, the court recited the test to be used in determining whether a grantor has the requisite mental capacity to execute a deed: "[T]he grantor must have sufficient mind and memory to comprehend the nature and effect of his act, and if he is able to understand in a reasonable manner the nature and effect of the business in which he is engaged and is exercising his own will, his deed is valid."

The defendants place primary reliance upon *Kolze, Eslick* and *Redmon* in support of their contention that Barth was mentally competent on the days in question. All three of these cases deal with the attempted rescission of a deed executed by an alleged incompetent on grounds of fraud, overreaching, and/or undue influence. The *Redmon* case is the most factually similar to the case at bar. In *Redmon*, the plaintiff sought to set aside a mineral deed which she alleged was "obtained through fraud and misrepresentation pursuant to a fraudulent and unlawful conspiracy entered into by the defendants." (381 Ill. 610, 612, 48 N.E.2d 355, 356.) As in the case before us, testimony which concerned the grantors' respective mental capacities was conflicting. After carefully weighing all of the evidence, the court found that the grantors were competent when they executed the deeds, and further found no evidence of fraud.

However, *Redmon, Eslick* and *Kolze*, while they all bear some similarity to this case, are all factually distinguishable. In *Redmon*, the sole defendant apparently did not testify on his own behalf on the subject of the grantors' competency. In addition, the plaintiff-conservator herself was present when the pertinent documents were executed prior to her appointment, a fact to which the supreme court gave much weight. In *Eslick*, no solid testimony was given at trial on the subject of the grantor's mental capacity. The only evidence given was that she "suffered from numerous physical problems quite commonly found in those of advanced years and that her mind wandered on occasion." (3 Ill. App. 3d 447, 451, 278 N.E.2d 412, 416.) In *Kolze*, not only was there a conflict in the testimony given by physicians regarding the grantor's competency, but there was also an absence of lay testimony on the subject of the mental capacity of the grantor.

■ The factual differences between the case before us and *Kolze, Redmon* and *Eslick* indicate that cases in which the incompetency of a grantor is alleged and the rescission of a deed sought must out of necessity be adjudicated on a case by case basis. Before a court finds that an individual was competent (*Kolze, Redmon, Eslick*) or incompetent (see, e.g., *Citizens National Bank v. Pearson* (1978), 67 Ill. App. 3d 457, 384

N.E.2d 548; *Bailer v. McCarthy* (1942), 317 Ill. App. 215, 46 N.E.2d 105) at the time a certain document was executed, it must engage in a careful weighing of oftentimes conflicting and contradictory evidence, and form an opinion as to the credibility and veracity of numerous witnesses.

The only testimony given in this case which relates to Barth's mental capacity on December 29, 1975, and January 9, 1976, excluding Dr. Gallagher's response to the second hypothetical, was given by defendants Gordon Gregory and Albin Dommermuth, both highly interested witnesses. As expected, both Gordon Gregory and Dommermuth testified that on these occasions Barth seemed capable of executing legal documents. None of the witnesses who testified on the behalf of plaintiff was present when Barth executed the deed, the land trust agreement, and the direction to sell, so the testimony of Gregory and Dommermuth in this respect is uncontradicted.

However, the testimony of Gregory and Dommermuth must be read in light of the testimony of the numerous disinterested witnesses who testified on the behalf of the plaintiff, which we have summarized above in some detail. Although none of these witnesses could testify to Barth's mental competence on December 29 and January 9, the obvious conclusion to be drawn from their testimony as a whole is that Barth was incompetent during the time frame in question, including those days. In fact, Dr. Gallagher's response to a hypothetical question was that in his opinion, Barth was mentally incompetent on December 29 and January 9.

Defendants place a great deal of reliance on Dr. Carducci's statement that Barth could have intervals of lucidity in which he could have the requisite mental capacity to execute a legal document. However, we think it unusual for Barth to be disoriented and confused on every occasion when a disinterested witness saw him, but perfectly lucid whenever he was in the presence of one of the defendants. The discrepancy becomes even more profound considering Carducci's statement that it was more likely Barth could have a lucid interval in familiar surroundings than in unfamiliar surroundings. Carducci stated that in his opinion, an attorney's office or a real estate broker's office Barth had not been into prior to December 1, 1975, could not be considered to be familiar surroundings. Yet the defendants testified that when Barth was in these places he was perfectly normal. To suggest that Barth was lucid on December 29 and January 9, because he had become sufficiently familiar with Gregory's and Dommermuth's offices during previous lucid intervals, is absurd, particularly considering the limited contacts with those offices prior thereto and the totality of the testimony relating to his mental condition at surrounding times.

The resolution of this case hinges upon one factor—credibility of the

witnesses. We find the credibility of Gordon Gregory highly questionable at best. Gregory testified that he visited Barth's home many times from December 1975 to March 1976 and suggested he never saw anything unusual; Barth was always "sharp," his house always normal. This directly contradicts testimony by numerous disinterested witnesses, whose descriptions of Barth and his home during this same time period we need not repeat.

There are other statements made by Gregory which cause us to doubt his veracity. John Werr testified that on March 15, he saw Gregory and asked him about the purpose of some survey flags he saw on Barth's property. Gregory told him that they were for a topographical survey for agricultural purposes. Gregory also told him on this occasion that the land was going to be sold for $8,600 an acre (when in fact the price was $5,161 per acre and the transaction had been all but consummated), and that although he had set up a trust for Barth, he did not know who the beneficiaries were (when in fact he and Gus Pakosta were made beneficiaries of the trust created February 27 with their wives as successor beneficiaries). Everett Gregory testified that on November 5, 1975, he prepared a proposed listing agreement (identical to the actual agreement signed by Barth on December 22) from notes Gordon Gregory had obtained from Barth. This "letter" Everett prepared contained the proposed conditions and terms of the sale. Everett testified that on November 5 he sat down with his brother and "discussed, and prepared notes that ended up in this typewritten form." Gordon Gregory, however, testified that it was not until the first 10 days of December that Barth began to express a sincere interest in selling his farm:

"Q. And, prior to that time, had you began to do anything about putting any details together regarding the sale of the farm?

A. Prior to that, no.

Q. Prior to that had you even discussed the sale of the Barth farm with your brother and anyone else?

A. Only to the point of telling him that it—That Bernie was now showing—beginning to show a serious interest.

Q. Anything further that you discussed with your brother about the sale of the Barth farm?

A. Not at that time, no."

Gordon Gregory's questionable veracity on the witness stand, combined with his appearance as a beneficiary in Barth's pour-over trust (along with his wife, whom Barth had never met) and the uncontradicted testimony that Gregory was bringing Barth liquor, makes it obvious that he was an individual who saw an opportunity to make a $24,000 broker's commission for himself and his employer at the expense of an aged and

mentally deficient individual unable to appreciate the legal ramifications of his actions. Such an act we cannot condone. We believe that the close of plaintiff counsel's examination of Gregory speaks for itself:

"Q. Now you testified that you received a part of the commission. What part or what services did you perform in finding a buyer for this property?

A. I did not work on that end of it.

Q. What service—what end did you work on?

A. With Mr. Barth.

Q. What was your end to work with Mr. Barth?

A. Exactly what we have been discussing all afternoon.

Q. Just to keep him out of trouble and keep him happy, is that correct?

A. Sure, keeping him in good living condition.

MR. REYNOLDS: Nothing further, your Honor."

Defendant Albin Dommermuth's testimony, with that of bank employees Richardson (who saw Barth twice briefly) and Condon, stands alone against the testimony of plaintiff's disinterested witnesses. We simply do not believe that a 72-year-old man who was confused, disoriented and unable to take care of himself on every single occasion when witnessed by individuals who have nothing to gain by a finding of incompetency, and who was found to be incompetent by two doctors on two separate occasions, could have been able to understand the nature and effect of his actions on December 29 and January 9. In *Trauscht v. Gunkel* (1978), 58 Ill. App. 3d 509, 516, 374 N.E.2d 843, 847-48, the court said, "When an appeal is taken on the ground that the judgment is against the manifest weight of the evidence, it is not sufficient to show that there is sufficient evidence to support a contrary judgment. To be successful the evidence in behalf of the party prosecuting the appeal must be so strong and convincing as to completely overcome the evidence existing in favor of the opposing party. [Citations.] In considering this question, the court must consider all the evidence in its aspects most favorable to the appellee [citation], and if there is evidence, which, if believed, would support the verdict, this court should not interfere with the result." We believe that the plaintiff has met this burden.

However, we do not believe that plaintiff has proven a conspiracy to defraud Barth. In *Welch v. Brunswick Corp.* (1973), 10 Ill. App. 3d 693, 698, 294 N.E.2d 729, 732, the court set forth the elements of fraud which are necessary to sustain both an action at law and rescission of a contract in equity:

"There must be a misrepresentation of a material fact, made for the purpose of inducing action. The misrepresentation must be

known to be such by the party making it or not reasonably believed by him to be true. The party to whom it is made must be ignorant of its falsity, must reasonably believe it to be true, must act upon it to his damage and in so acting must rely upon its truth. *Roth v. Roth*, 45 Ill. 2d 19; *Roda v. Berko*, 401 Ill. 335; *Bouxsein v. First National Bank of Granville*, 292 Ill. 500."

If there was any misrepresentation at all in this case, it would have to be in the value of the farm. However, only two appraisals of Barth's property were introduced into evidence. The plaintiff's appraiser testified that the land was worth $8,600 an acre and the defendants' appraiser testified that the land was worth $5,600 per acre. The eventual sale price of $5,161 is obviously lower than even the defendants' appraisal, but this in itself does not cause the transaction to be fraudulent, and given the subjective nature of real estate appraisals, we will not accept the appraisal of one or the other as being indicative of the actual value of the property. Thus, we find no active misrepresentation on the part of any of the defendants. In addition, our reading of the entire record indicates no conspiracy among the defendants.

■ Because we hold in this case that Barth was incompetent on the days the pertinent documents were executed, we need not reach the merits of the plaintiff's second contention that the counterclaim of Naperville National Bank against plaintiff for attorneys' fees is excessive. The counterclaim for fees is based upon an interpretation of the December 29 land trust agreement which provides that the beneficiaries will pay reasonable attorneys' fees to the trustee when such fees are earned as a result of litigation involving the trustee. However, since we find that Barth was incompetent when the land trust agreement was executed, and thus the trust invalid, any determination of that issue on the merits is unnecessary.

For the foregoing reasons, the judgment of the circuit court of Will County is reversed and remanded for proceedings consistent with this opinion.

Judgment reversed and remanded with directions.

STOUDER, P. J., and SCOTT, J., concur.