*In re* ESTATE OF JOSEPH CLEMENTS, Deceased (Mary Kirk, Adm'r of the Estate of Joseph Clements, Petitioner-Appellee, v. Charles Clements, Respondent-Appellant).

Fifth District   No. 5—86—0220

Opinion filed February 19, 1987.

Richard O. Hart and A. Courtney Cox, both of Hart & Hart, of Benton, for appellant.

E. Kyle Vantrease and Susan A. Vantrease, both of Vantrease & Vantrease, of West Frankfort, for appellee.

PRESIDING JUSTICE KARNS delivered the opinion of the court:

The administrator of the estate of Joseph Clements brought a citation to recover assets and discover information against Charles Clements alleging that certain accounts transferred into joint tenancy on January 7 and 31, 1983, were property of the estate and not the property of Charles Clements as surviving joint tenant. The trial court found that Joseph Clements was not competent to make a gift of the accounts at the time each was made and ordered Charles Clem-

ents to turn over the accounts and accrued interest to the estate. Charles Clements appeals the trial court's decision. We affirm.

Joseph Clements died intestate on March 26, 1983, leaving as heirs two brothers, two nieces, and one nephew, Charles Clements. The approximate value of the personal estate was $500. The administrator, one of Joseph Clements' nieces, sought to recover from Charles Clements (Charles) $7,327 deposited into a savings account on January 7, 1983, at the Bank of West Frankfort; $247.10 deposited into a savings account on January 31, 1983, at the First Community Bank of West Frankfort; and two certificates of deposit totaling $43,000 issued on January 31, 1983, at First Community Bank of West Frankfort.

Joseph Clements, decedent, was 80 years old at the time of his death. He was a double amputee and an alcoholic. He was also diagnosed by various doctors as suffering from emphysema, pleural effusion, chronic obstructive pulmonary disease, bronchogenic carcinoma, black lung disease, hypoxemia, and organic brain syndrome.

From December 7, 1982, through January 10, 1983, decedent was hospitalized at the UMWA Hospital in West Frankfort. Charles testified he saw his uncle almost every day during this stay. According to Charles, decedent always recognized him and his wife and did not appear confused. One of Charles' neighbors who came to visit decedent four or five times at the hospital stated decedent did not appear to be confused and that decedent always recognized him and called him by his nickname. He further testified decedent told him he was going to leave his money to his nephew for taking care of him. One of decedent's nieces, who was also an employee at the hospital, testified she visited decedent every day during his stay at UMWA Hospital and at times he was confused and did not recognize her. The orderly who attended decedent on a daily basis similarly testified decedent would be confused and combative and swearing one day and the next day would be quiet. It was during this time period that the first transfer of accounts occurred.

On January 10, 1983, decedent was transferred from UMWA Hospital to Memorial Hospital in Carbondale. Decedent was referred to a pulmonary specialist, Dr. Sanjabi. Dr. Sanjabi examined decedent on that day and found him to be communicative. He was not able to get, however, a clear history from decedent of his medical condition and had difficulty with decedent's mental status. Dr. Sanjabi further noted physical atrophy, or a shrinking of both sides of the cortex, on the CT scan of decedent's head. He asked Dr. Modali, a psychiatrist, to examine decedent.

Dr. Modali first examined decedent on January 24, 1983. She was not able to obtain a history from him because he was disoriented, agitated, talking to himself, trying to get out of bed, and hallucinating. He was not oriented to person, place, or time and so confused that she could not test his memory or mental capacity. Dr. Modali also saw decedent on January 25, 26, and 27. Each time decedent was still disoriented to various degrees. On the 27th of January, decedent was alert, restless, agitated, and paranoid. He believed he had been kidnaped and was being imprisoned in the hospital. Dr. Modali diagnosed decedent as suffering from chronic, or irreversible, organic brain syndrome. This disease affects a person's complete mental condition, including judgment and decision making. Symptoms include loss of memory, confusion, paranoia, and hallucinations. Dr. Modali also testified that it is not uncommon for a person with organic brain syndrome to have severe fluctuations in his mental state on even an hourly basis.

During his stay at Memorial Hospital, on January 18, 1983, two officers of First Community Bank of West Frankfort visited decedent. These bank officers were sent by the head cashier of the bank, who had been approached earlier by Charles with a note requesting that Charles be put on decedent's accounts. The officers explained to decedent the effect of putting his accounts into joint tenancy. Decedent refused to place his accounts into joint tenancy. Both men believed decedent was not confused.

On January 28, 1983, decedent was released from Memorial Hospital and went to Charles' home. On January 31, 1983, two employees of First Community Bank of West Frankfort again visited decedent in order to have him sign a signature card putting Charles' name on his accounts. The two men explained joint tenancy accounts to decedent. Decedent signed the card stating this meant Charles had a right to his money. Both employees believed decedent knew what he was doing.

Later that same day, decedent was readmitted to UMWA Hospital with severe shortness of breath. The treating physician noted that decedent rambled at times and at other times was coherent, but otherwise made no mention of decedent's mental state on that day.

Decedent was discharged from UMWA Hospital on February 15, 1983, whereupon he again went to live with Charles. After a series of readmissions to hospitals and returns to Charles' house, decedent died in a nursing home on March 26, 1983.

Charles argues the administrator did not prove by clear and convincing evidence that decedent was not competent to make a gift.

Charles concludes the finding of the trial court is against the manifest weight of the evidence.

The creation of a joint tenancy account gives rise to the presumption that a gift to the surviving joint tenant is intended. (*E.g., In re Estate of Zengerle* (1971), 2 Ill. App. 3d 98, 100, 276 N.E.2d 128, 129.) To rebut this presumption, the party contesting the transfer must establish by clear and convincing evidence that a gift was not intended. (*E.g., Murgic v. Granite City Trust & Savings Bank* (1964), 31 Ill. 2d 587, 591, 202 N.E.2d 470, 472.) Clear and convincing evidence is that which leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question. (See *In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 14, 398 N.E.2d 198, 203; *People v. Ralls* (1974), 23 Ill. App. 3d 96, 100, 318 N.E.2d 703, 706.) The administrator has met this burden.

The test of a donor's mental capacity to make a gift is whether at the time of the transaction the donor had the ability to comprehend the nature and effect of his act. (See *In re Estate of Payton* (1979), 79 Ill. App. 3d 732, 739, 398 N.E.2d 977, 982; *Barth v. Gregory* (1979), 79 Ill. App. 3d 510, 522-23, 398 N.E.2d 849, 858.) Illness and impairment of the mind incident to old age do not necessarily indicate so great a deterioration of capacity that an individual is unable to understand the nature and effect of the transaction or to protect his own interests. (See *Barth v. Gregory* (1979), 79 Ill. App. 3d 510, 522-23, 398 N.E.2d 849, 858; *In re Estate of Trahey* (1975), 25 Ill. App. 3d 727, 733, 323 N.E.2d 813, 817; *In re Estate of Foster* (1969), 104 Ill. App. 2d 447, 452, 244 N.E.2d 620, 623.) If the donor is incompetent at the time of the alleged gift, however, the presumption of donative intent is completely overcome. *In re Estate of Trahey* (1975), 25 Ill. App. 3d 727, 734, 323 N.E.2d 813, 818.

We find ample evidence on the record of the decedent's behavior and mental condition being far from normal from the date of his initial hospitalization at UMWA Hospital on December 7, 1982, until his death in March of 1983. Both employees of the hospital and decedent's relatives often found decedent to be confused and his mental status fluctuating daily. The sicker he became, the more confused he became. Three days after the first transfer of accounts, decedent was suspected of suffering from chronic organic brain syndrome. All of decedent's subsequent treating physicians believed he was not mentally competent to know and understand the nature and extent of his property or the nature and effect of a transfer of assets. Naturally Charles' witnesses did not find decedent to be confused and disoriented. While this may fit in with the nature of decedent's disease, we

find it somewhat unusual for decedent to be perfectly lucid whenever he was in the presence of one of Charles' witnesses and disoriented and confused when in the presence of other disinterested witnesses. (See *Barth v. Gregory* (1979), 79 Ill. App. 3d 510, 524, 398 N.E.2d 849, 859.) Moreover, the only two disinterested witnesses who saw decedent make the second transfer, the two bank employees, never discussed with decedent what accounts he had or the amounts contained in them. They were only in decedent's presence for three to four minutes.

The resolution of this case hinges upon one factor only—the credibility of the witnesses. The trial court heard the witnesses and observed their demeanor. Moreover, it was not limited to looking only to the events at the time the accounts were created. (See *In re Estate of Trahey* (1975), 25 Ill. App. 3d 727, 733, 323 N.E.2d 813, 817; *In re Estate of Dawson* (1968), 103 Ill. App. 2d 362, 367, 243 N.E.2d 1, 3.) It was free to consider other surrounding circumstances and events as well as tangible evidence of decedent's physical deterioration, graphically represented by decedent's signatures on the accounts cards. (See *In re Estate of Trahey* (1975), 25 Ill. App. 3d 727, 734, 323 N.E.2d 813, 818.) Based on all of this evidence, the trial court could reasonably infer that at the time of the transfers, decedent lacked the mental capacity to comprehend the consequences of his actions which depleted his estate.

Charles argues, however, the trial court erred in giving more weight to the testimony of the doctors than that of lay witnesses. While correct in asserting that the testimony of physicians on the issue of mental capacity is not entitled to any greater weight than that of laymen (see *Tyler v. Tyler* (1948), 401 Ill. 435, 441, 82 N.E.2d 346, 349), Charles fails to recognize that the "value of an opinion on competency *** is measured by the facts and circumstances which form [a] reasonable ground for the witness' determination of mental capacity." (*Yochim v. Board of Trustees of Public School Teachers' Pension & Retirement Fund* (1982), 105 Ill. App. 3d 945, 949, 435 N.E.2d 206, 209.) The testimony of decedent's treating physicians is uncontradicted. Charles' witnesses support that of the doctors to the extent decedent's condition fluctuated daily, even hourly. The record does not reveal that Charles' disinterested witnesses had sufficient contact with decedent to support their testimony of apparent competency in the face of the three doctors' medical knowledge of decedent. (105 Ill. App. 3d 945, 949, 435 N.E.2d 206, 209.) We find no error in the trial court's choosing to believe the expert witnesses on the issue of mental capacity in this instance. *Cf. In re Estate of Vardalos*

896

(1974), 24 Ill. App. 3d 520, 525-26, 320 N.E.2d 568, 572.

■■ Charles has not presented evidence strong or convincing enough to completely overcome the evidence existing in favor of the administrator. (See *Barth v. Gregory* (1979), 79 Ill. App. 3d 510, 526, 398 N.E.2d 849, 860.) We will not substitute our judgment for that of the trial court, which was in a superior position to judge the credibility of the witnesses and to determine the weight of the evidence. See, *e.g., Kelley v. First State Bank* (1980), 81 Ill. App. 3d 402, 408, 401 N.E.2d 247, 252; *In re Estate of Foster* (1969), 104 Ill. App. 2d 447, 454, 244 N.E.2d 620, 624.

■■ For the aforementioned reasons, we affirm the judgment of the circuit court of Franklin County finding Joseph Clements not competent to make a gift and ordering Charles Clements to turn over the disputed accounts and accrued interest to the estate.

Affirmed.

JONES and KASSERMAN, JJ., concur.